RECORD NOS. 13-1996(L), 13-1997 XAP

In The

# United States Court of Appeals

### For The Fourth Circuit

## CENTRAL RADIO COMPANY INC.;
## ROBERT WILSON; KELLY DICKINSON,

*Plaintiffs – Appellants/Cross-Appellees*,

**v.**

## CITY OF NORFOLK, VIRGINIA,

*Defendant – Appellee/Cross-Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### AT NORFOLK

———————

### CORRECTED BRIEF OF APPELLANTS/CROSS-APPELLEES

———————

Robert P. Frommer
Erica Smith
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

*Counsel for
 Appellants/Cross-Appellees*

Michael E. Bindas
INSTITUTE FOR JUSTICE
10500 NE 8th Street, Suite 1760
Bellevue, Washington 98004
(425) 646-9300

*Counsel for
 Appellants/Cross-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-1996L__        Caption: _Central Radio Co., et al. v. Norfolk_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Kelly Dickinson_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
         (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                               ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Robert P. Frommer             Date:         08/14/2013

Counsel for: Appellant

## CERTIFICATE OF SERVICE
***************************

I certify that on _____08/14/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Robert P. Frommer                              08/14/2013
_____                    _____
(signature)                                              (date)

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
### DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-1996L          Caption: Central Radio Co., et al. v. Norfolk

Pursuant to FRAP 26.1 and Local Rule 26.1,

Robert Wilson
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
          (appellant/appellee/amicus)


1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.   Does party/amicus have any parent corporations?  ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:


3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
     If yes, identify all such owners:


- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Robert P. Frommer _____    Date: _____ 08/14/2013 _____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____ 08/14/2013 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Robert P. Frommer _____          _____ 08/14/2013 _____
        (signature)                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-1996L        Caption: Central Radio Co., et al. v. Norfolk

Pursuant to FRAP 26.1 and Local Rule 26.1,

Central Radio Company, Inc.
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
    (appellant/appellee/amicus)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Robert P. Frommer _____    Date: _____08/14/2013_____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____08/14/2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Robert P. Frommer _____        _____08/14/2013_____
       (signature)                                        (date)

07/19/2012                 - 2 -
SCC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iv

I.      INTRODUCTION ..............................................................1

II.     JURISDICTIONAL STATEMENT ...................................1

III.    STATEMENT OF ISSUES ...............................................2

IV.     STATEMENT OF THE CASE ..........................................3

V.      STATEMENT OF FACTS .................................................4

        A.      Central Radio's Attempt To Protest Eminent Domain Abuse .............4

        B.      The Complaint From ODU And The City's Crackdown On Central Radio...........................7

        C.      Norfolk's Sign Code...............................................8

                1.      The Sign Code's Content-Based Exemptions...........................10

                2.      Norfolk's Allowance Of Other Oversized Signs .....................11

        D.      The Current Status Of Central Radio's Banner..................................13

VI.     SUMMARY OF ARGUMENT.................................................14

VII.    ARGUMENT.........................................................................16

        A.      STANDARD OF REVIEW ............................................16

        B.      THE CITY'S SIGN-CODE PROVISIONS VIOLATE FREE SPEECH ..............................17

                1.      The City's Sign-Code Provisions Are Content-Based..............17

        a.     Courts Reviewing Substantively Identical Sign-Code Provisions Have Found Them Content-Based......17

        b.     Even Under This Court's "Practical" Approach, The Sign Code Is Content Based....................................20

    2.     The Sign-Code Provisions Fail Strict Scrutiny........................27

    3.     The City's Sign-Code Provisions Fail Intermediate Scrutiny .....................................................................................28

        a.     The City Has The Burden To Prove The Sign-Code Provisions Survive Intermediate Scrutiny ...........29

        b.     The Restrictions Applied To Central Radio's Banner Do Not Serve A Substantial Governmental Interest ................................................................................32

        c.     The Restrictions Applied To Central Radio's Banner Are Not Narrowly Tailored................................37

        d.     The Restrictions On Central Radio's Banner Do Not Leave Open Ample And Adequate Alternatives....................................................................39

C.     THE SIGN CODE'S CERTIFICATE REQUIREMENT EFFECTS AN UNCONSTITUTIONAL PRIOR RESTRAINT ON CENTRAL RADIO'S SPEECH ..................................................43

    1.     The Permit Requirement Is Unconstitutional Because It Lacks Standards .......................................................................43

    2.     The Permit Requirement Is Unconstitutional Because It Lacks A Time Limit.................................................................48

D.     THE CITY SELECTIVELY ENFORCED THE SIGN CODE IN VIOLATION OF THE FOURTEENTH AND FIRST AMENDMENTS...................................................................................49

1.    The City's Enforcement Of The Sign Code Was
Discriminatory In Effect ...........................................................50

2.    The City's Enforcement Of The Sign Code Was
Discriminatory In Purpose .......................................................54

VIII.  STATEMENT REGARDING ORAL ARGUMENT ...................................60

IX.    CONCLUSION...............................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Legion Post 7 v. City of Durham*,
239 F.3d 601 (4th Cir. 2001) ......................................................29, 31, 32, 39

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
__ U.S. __, 131 S. Ct. 2806 (2011) ...........................................................27

*Arlington Cnty. Republican Comm. v. Arlington Cnty.*,
983 F.2d 587 (4th Cir. 1993) ........................................................................34

*Baltimore Gas and Elec. Co. v. Heintz*,
760 F.2d 1408 (4th Cir. 1985) ......................................................................54

*Bonita Media Enters. v. Code Enforcement Bd.*,
No. 2:07-cv-411-FtM-29DNF,
2008 WL 423449 (M.D. Fla. Feb. 13, 2008).................................................18

*Brown v. Town of Cary*,
706 F.3d 294 (4th Cir. 2013) ................................................................*passim*

*Campbell v. City of New Kensington*,
No. 05-0467, 2009 WL 3166276 (W.D. Pa. Sep. 29, 2009) ........................58

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)................................................................................19, 23

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985)......................................................................................59

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994)........................................................................................41

*City of Lakewood v. Colfax Unlimited Ass'n, Inc.*,
634 P.2d 52 (Colo. 1981)..............................................................................18

*City of Lakewood v. Plain Dealer Publ'g Corp.*,
  486 U.S. 750 (1988).....................................................................................43

*City of Watseka v. Ill. Pub. Action Council*,
  796 F.2d 1547 (7th Cir. 1986), *aff'd*,
  479 U.S. 1048 (1987) .................................................................................39

*Clatterbuck v. City of Charlottesville*,
  708 F.3d 549 (4th Cir. 2013) ...............................................................*passim*

*Clear Channel Outdoor, Inc. v. Town Bd.*,
  352 F. Supp. 2d 297 (N.D.N.Y. 2005) ............................................18, 24, 28

*Complete Angler, LLC v. City of Clearwater*,
  607 F. Supp. 2d 1326 (M.D. Fla. 2009) ..........................................18, 26, 47

*Connally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926).....................................................................................47

*Covenant Media v. City of N. Charleston*,
  493 F.3d 421 (4th Cir. 2007) .................................................................43, 48

*Davenport v. City of Alexandria*,
  710 F.2d 148 (4th Cir. 1983) (en banc) .......................................................30

*Desert Outdoor Adver., Inc. v. City of Moreno Valley*,
  103 F.3d 814 (9th Cir. 1996) .......................................................................18

*Dimmitt v. City of Clearwater*,
  985 F.2d 1565 (11th Cir. 1993) .............................................................18, 24

*Edenfield v. Fane*,
  507 U.S. 761 (1993).....................................................................................30

*FEC v. Wis. Right to Life, Inc.*,
  551 U.S. 449 (2007).....................................................................................40

*FSK Drug Corp. v. Perales*,
  960 F.2d 6 (2d Cir. 1992) ......................................................................54, 55

v

*Fla. Star v. B.J.F.*,
  491 U.S. 524 (1989)...................................................................35

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992)................................................................*passim*

*Gardenhire v. Schubert*,
  205 F.3d 303 (6th Cir. 2000) .....................................................49

*Gentile v. State Bar of Nevada*,
  501 U.S. 1030 (1991) ................................................................50

*Goward v. Minneapolis*,
  456 N.W.2d 460 (Minn. Ct. App. 1990) ...............................24, 42

*Horina v. City of Granite City*,
  538 F.3d 624 (7th Cir. 2008) ...........................................32, 34, 37

*Household Goods Carriers' Bureau v. ICC*,
  584 F.2d 437 (D.C. Cir. 1978)...................................................47

*Imaginary Images, Inc. v. Evans*,
  612 F.3d 736 (4th Cir. 2010) .....................................................39

*In re Primus*,
  436 U.S. 412 (1978)..................................................................50

*Indep. News, Inc. v. City of Charlotte*,
  568 F.3d 148 (4th Cir. 2009) .....................................................29

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ...................................................38

*Krantz v. City of Fort Smith*,
  160 F.3d 1214 (8th Cir. 1998) ...................................................39

*Kuba v. 1-A Agric. Ass'n*,
  387 F.3d 850 (9th Cir. 2004) ...............................................32, 38

*Linmark Assocs., Inc. v. Willingboro*,
　　431 U.S. 85 (1977)................................................................41, 42

*Long Island Vietnam Moratorium Comm. v. Cahn*,
　　437 F.2d 344 (2d Cir. 1970) ...........................................50

*Lusk v. Vill. of Cold Spring*,
　　418 F. Supp. 2d 314 (S.D.N.Y. 2005), *rev'd in part on other grounds*,
　　475 F.3d 480 (2d Cir. 2007) ...................................27, 28

*M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*,
　　981 F.2d 160 (4th Cir. 1992) (en banc) .........................16

*McCurdy v. Montgomery Cnty.*,
　　240 F.3d 512 (6th Cir. 2001) .......................................55-56

*Metromedia v. City of San Diego*,
　　453 U.S. 490 (1981).......................................................20

*Meyer v. Grant*,
　　486 U.S. 414 (1988).......................................................40

*Midwest Media Prop., L.L.C. v. Symmes Twp.*,
　　503 F.3d 456 (6th Cir. 2007) .......................................27

*Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*,
　　429 U.S. 274 (1977).......................................................54

*Multimedia Publ'g Co. of South Carolina, Inc. v.*
*Greenville-Spartanburg Airport Dist.*,
　　991 F.2d 154 (4th Cir. 1993) .......................................31

*Nat'l Adver. Co. v. City of Orange*,
　　861 F.2d 246 (9th Cir. 1988) ...................................18, 27

*Neighborhood Enters., Inc. v. City of St. Louis*,
　　644 F.3d 728 (8th Cir. 2011), *cert. denied*,
　　132 S. Ct. 1543 (2012)............................................*passim*

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
  597 F.3d 570 (4th Cir. 2010) ...........................................................25, 30, 31

*Nixon v. Shrink Mo. Gov't PAC*,
  528 U.S. 377 (2000)...................................................................................30

*PKO Ventures, LLC v. Norfolk Redev. & Hous. Auth.*,
  747 S.E.2d 826 (Va. 2013) ......................................................................4, 5

*Pagan v. Fruchey*,
  492 F.3d 766 (6th Cir. 2007) (en banc) ...............................................32, 34

*Palmore v. Sidoti*,
  466 U.S. 429 (1984)...................................................................................59

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983).....................................................................................31

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)...................................................................................37

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997)...................................................................................54

*Salve Regina Coll. v. Russell*,
  499 U.S. 225 (1991)...................................................................................16

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975).......................................................................43, 45, 49

*Serv. Emps. Int'l Union, Local 5 v. City of Houston*,
  595 F.3d 588 (5th Cir. 2010) .....................................................................20

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ..............................................................54, 59

*Solantic, LLC v. City of Neptune Beach*,
  410 F.3d 1250 (11th Cir. 2005) .....................................................18, 20, 23

*Stormans, Inc. v. Selecky*,
  854 F. Supp. 2d 925 (W.D. Wash. 2012) ....................................................60

*Students Against Apartheid Coal. v. O'Neil*,
  660 F. Supp. 333 (W.D. Va. 1987)...............................................................40

*Tacynec v. City of Philadelphia*,
  687 F.2d 793 (3d Cir. 1982) ........................................................................59

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002) ................................................................. 57-58

*Thomas v. Chi. Park Dist.*,
  534 U.S. 316 (2002)......................................................................................44

*Turner v. Hallberg*,
  No. 04-276-KI, 2005 WL 2104999 (D. Or. Aug. 30, 2005) ........................52

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994)................................................................................19, 30

*United States v. Armstrong*,
  517 U.S. 456 (1996)......................................................................................50

*United States v. Crowthers*,
  456 F.2d 1074 (4th Cir. 1972) .....................................................................57

*United States v. Kokinda*,
  497 U.S. 720 (1990)................................................................................31, 32

*United States v. Playboy Entm't Group, Inc.*,
  529 U.S. 803 (2000)......................................................................................29

*Wag More Dogs, Ltd. Liab. Corp. v. Cozart*,
  680 F.3d 359 (4th Cir. 2012) .................................................................19, 46

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)................................................................................37, 38

*Wayte v. United States*,
    470 U.S. 598 (1985).....................................................................50, 54

*Weinberg v. City of Chicago*,
    310 F.3d 1029 (7th Cir. 2002) ..............................................34, 42

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)............................................................55, 56, 57, 58

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I.........................................................................*passim*

U.S. Const. amend. XIV ...........................................................3, 16, 49

## CODE

Norfolk, Va., Code app. A, § 23-4.1.....................................................13

## STATUTES

28 U.S.C. § 1291 ....................................................................................2

28 U.S.C. § 1331 ................................................................................ 1-2

28 U.S.C. § 1343 ....................................................................................2

42 U.S.C. § 1983....................................................................................2

## OTHER

NRHA, Builders' and Designers' Guild 2008 Manual 4,
http://www.nrha.us/userfiles/file/BuildersGuildManual_08.pdf .............................4

NRHA, Redevelopment Plan for the Hampton Boulevard Redevelopment Project
    (Jan. 12, 1998),
        *available at* http://www.norfolk.gov/documentcenter/view/1656  ...............58

Jillian Nolin, *Cuccinelli campaigns for eminent domain amendment*,
    The Virginian-Pilot, Sept. 7, 2012,
    http://hamptonroads.com/2012/09/cuccinelli-campaigns-eminent-domain-
    amendment ........................................................................................................6

Karl S. Coplan, *Rethinking Selective Enforcement in the First Amendment Context*,
    84 Colum. L. Rev. 144 (1984) ......................................................................54

## I.    INTRODUCTION

This is a free speech and equal protection challenge to Norfolk's suppression of a banner protesting the unlawful use of eminent domain against Central Radio. After a state trial court ruled that the Norfolk Redevelopment and Housing Authority could seize Central Radio's property and give it to Old Dominion University for a retail development project, Central Radio protested the impending seizure with a large banner on the very building threatened with eminent domain. When a senior official at Old Dominion complained about the banner, the City cited Central Radio for violating a size restriction and permit requirement in the City's sign code.  Central Radio was forced to cover the banner with a tarp for the duration of its eminent domain battle.

On September 12, 2013, the Virginia Supreme Court vindicated Central Radio's property rights, holding the attempt to take its property unlawful.  Central Radio now seeks to vindicate its free speech rights, and so challenges the unlawful suppression of its protest banner.

## II.    JURISDICTIONAL STATEMENT

This appeal is from an Order and Judgment:  (1) denying summary judgment to Central Radio Company, Inc., Robert Wilson, and Kelly Dickinson (collectively, "Central Radio"); and (2) granting summary judgment to the City of Norfolk.  J.A. 1200-16.  The district court had original jurisdiction pursuant to:  28 U.S.C. §

1

1331, because this action arose under the Constitution and laws of the United States; and 28 U.S.C. § 1343, because the action involves claims brought under the 42 U.S.C. § 1983.  The Order and Judgment disposed of all remaining claims. They are accordingly final, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

The Order and Judgment were entered on May 15, 2013.  Central Radio attempted to file a timely notice of appeal on June 11, 2013, and moved for an extension of time upon learning the CM/ECF filing had been unsuccessful.  J.A. 1218.  On July 30, 2013, the district court extended the deadline for the notice of appeal to August 6, 2013.  J.A. 1330.  Central Radio timely filed the notice on August 1, 2013.  J.A. 1331.

### III.    STATEMENT OF ISSUES

A.    Did the district court err in upholding the City's sign code and the City's application of it to Central Radio's banner under the First Amendment?

B.    Did the district court err in holding that the sign-code provisions the City applied to Central Radio's banner are content-neutral and subject only to intermediate scrutiny when they exempt such things as government flags and emblems, religious flags and emblems, and "works of art"?

C.    Did the district court err in holding the City carried its burden to prove the constitutionality of its sign code when it proffered no evidence to support the

2

code's constitutionality and failed to refute Central Radio's evidence demonstrating its unconstitutionality?

D.    Did the district court err in holding the City's sign-certificate requirement is not an unconstitutional prior restraint of speech, even though the evidence demonstrates the City enforces it in an *ad hoc* fashion; has no standard for determining whether something is a "sign" requiring a certificate or, rather, an exempted "work of art"; and has no time limit for acting on certificate applications?

E.    Did the district court err in holding the City's enforcement of the sign code—including its complaint-based method of enforcement—is permissible under the First and Fourteenth Amendments?

## IV.    STATEMENT OF THE CASE

Central Radio filed an action seeking declaratory and injunctive relief against the City of Norfolk on May 2, 2012. Their amended complaint asserted facial and as applied claims under the First and Fourteenth Amendments alleging that Norfolk's sign-code provisions: (1) whether content-based or content-neutral, violate the right to free speech; (2) effect an unconstitutional prior restraint on speech; and (3) are selectively enforced. J.A. 11, 18-23.

On May 4, 2012, the district court denied a temporary restraining order and on July 27, after an evidentiary hearing, denied a preliminary injunction. J.A. 3-5.

3

Following discovery, the parties cross-moved for summary judgment.  On May 15, 2013, the district court denied Central Radio's motion, granted Norfolk's, and entered judgment.  J.A. 1200-17.

## V.    STATEMENT OF FACTS

### A.    Central Radio's Attempt To Protest Eminent Domain Abuse

Central Radio has been building and servicing radio equipment in Norfolk since 1934.  J.A. 287:25.  For the past 50 years, it has been located on 39th Street and Hampton Boulevard; it deliberately chose this location for its proximity to the Norfolk naval base, as Central Radio's contracts with the Navy require it to respond quickly to service calls.  J.A. 292:1-13.  Central Radio had no intention of moving, but the government had other plans.

In 1998, the Norfolk City Council enacted the Hampton Boulevard Redevelopment Plan, which granted the Norfolk Redevelopment and Housing Authority ("NRHA") the power to take Central Radio's property and other surrounding properties.  *See PKO Ventures, LLC v. Norfolk Redev. & Hous. Auth.*, 747 S.E.2d 826, 828 (Va. 2013).  The NRHA is a chartered political subdivision created and appointed by the Norfolk City Council and is considered the land developer for the City.[1]  The Plan called on the NRHA to transfer the properties it

---

[1] *See* NRHA, Builders' and Designers' Guild 2008 Manual 4, http://www.nrha.us/userfiles/file/BuildersGuildManual_08.pdf.

4

acquired to the Old Dominion University (ODU) Real Estate Foundation, which in turn planned to build restaurants and retail shops.  *Id*. at 828-29.

Several years later, the NRHA informed Central Radio that it was going to take the company's land by agreement or eminent domain.  *See* J.A. 290:5-11. Central Radio had no desire to move, so it fought back in court.  But in February 2011, a state trial court ruled the NRHA could condemn the properties of Central Radio and other nearby owners.  J.A. 38, ¶3.

While waiting for the Virginia Supreme Court to review that decision, appellants Bob Wilson and Kelly Dickinson decided that putting public pressure on Norfolk might be the only way to save Central Radio.  J.A. 299:21-300:6.  They had previously spoken out to the public but found many people still did not understand their position; some even thought their goal was to profit from the eminent domain action rather than stay put.  J.A. 38-39, ¶4.  So Central Radio decided to speak out in the most effective way possible:  by putting a protest banner on the very building the NRHA was trying to seize.  *Id*.

On March 23, 2012, Bob and Kelly hung a 375-square-foot vinyl banner on the side of their building.  J.A. 294:22-295:12.  The banner read, "50 years on this street[,] 78 years in Norfolk[,]100 Workers[,] Threatened by Eminent Domain," and it included Central Radio's logo and an anti-eminent-domain-abuse symbol. J.A. 51.  They hung the banner facing Hampton Boulevard, a highway with

5

significant pedestrian and vehicular traffic; there, it would be seen by thousands of people every day, including City officials. J.A. 296:12-14; 304:25-305:8. By contrast, the front of Central Radio's building faces 39th Street—a quiet street with few cars and pedestrians. Bob and Kelly chose a 375-square-foot banner not only to ensure their message would be legible from the highway, which is 150 feet from their building, J.A. 304:17-24, but also because they wanted their protest to be a "shout," not a "whisper." J.A. 307:25-308:5.

The banner had an immediate impact. Central Radio received supportive calls and emails, and strangers stopped in to offer help. Cars honked approvingly when they were outside the building. J.A. 39, ¶5. They used the banner to organize a large protest rally, *id.*, and the Virginia Attorney General later held a press conference at Central Radio to promote a state constitutional amendment restricting the use of eminent domain.[2] The banner achieved what Bob and Kelly intended, turning Central Radio's building into a monument against eminent domain abuse in Norfolk. Unfortunately, this achievement was short-lived.

---

[2] Jillian Nolin, *Cuccinelli campaigns for eminent domain amendment*, The Virginian-Pilot, Sept. 7, 2012, http://hamptonroads.com/2012/09/cuccinelli-campaigns-eminent-domain-amendment.

6

**B.     The Complaint From ODU And The City's Crackdown On Central Radio**

The City investigated Central Radio's banner at the behest of the ODU Real Estate Foundation ("Foundation"), the very entity for which the NRHA was trying to seize Central Radio's property.  J.A. 893:10-894:19.  Foundation officials learned about the banner two days after Central Radio displayed it, J.A. 130, and they were concerned about the banner's message and how it (and they) would be received in the media.  *See* J.A. 125.

Shortly thereafter, a high-ranking Foundation official[3] complained about the banner to Rick Henn, a development official for Norfolk.  J.A. 160:15-161:3; 180; 893:18-894:22.  Mr. Henn immediately alerted Norfolk's zoning officials.  J.A. 162:12-163:4.

Typically, zoning inspectors investigate potential violations on their own.  J.A. 1064:2-1065:8.  But in this case, Norfolk's chief zoning inspector, Leslie Garrett, discussed the banner with top zoning officials:  Frank Duke, director of the Department of Planning and Development ("Planning Department"), and Leonard Newcomb, manager of the Planning Department's Land Use Services Bureau, which administers the sign code.  *See* J.A. 604:5-6; 786:9-10; 787:11-14; 670:12-18; 676:1-11.  Messrs. Duke and Newcomb ordered Ms. Garrett and Inspector

---

[3] The parties entered an agreed order to protect the complainant's identity.

7

Harold Tanner to commence enforcement.  J.A. 707:10-25; 712:22-713:8; 1076:13-16.

On April 5, 2012, Ms. Garrett and Mr. Tanner arrived at Central Radio and issued two citations.  J.A. 54-57.  One cited Central Radio for installing the banner without a permit; the other, for displaying a banner larger than 60 square feet.  Bob and Kelly were ordered to reduce the banner's size to 60 square feet or less and obtain a permit.  *Id*.; J.A. 1204.  Despite having worked for Norfolk since 1987, Ms. Garrett could not remember any other occasion where the City had issued a citation or even a warning for a protest or other political sign.  J.A. 1124:7-1125:20.

**C.    Norfolk's Sign Code**

Norfolk's sign code defines the term "sign" very broadly, *see* J.A. 250 (§ 2-3), and anyone wishing to display a sign must obtain a sign certificate from the City unless their sign is explicitly exempted.  J.A. 260 (§ 16-5).  The code contains no time limit for the City to act on certificate applications.

Central Radio is located in light industrial zoning district I-1.  J.A. 57.  The sign code allows three types of signs in the district:  wall signs, temporary signs, and freestanding signs.  J.A. 275 (§ 16-8.3); J.A. 1201.  None of these categories would allow Central Radio its 375-square-foot protest banner, regardless of where on the building it was placed.  J.A. 175.

8

It appears from the citations issued that the City considered the banner to be a temporary sign.  The sign code states that temporary signs in Zone I-1 are limited to six categories, with the largest allowed size being 60 square feet:  "construction signs (32 square feet)"; "noncommercial events (8 square feet)"; "political campaign (16 square feet)"; "real estate (16 square feet)"; "new project development (32 square feet)"; and "commercial sale event/new business/grand opening (60 square feet)."  J.A. 275 (§ 16-8.3(a)).  Although it is not entirely clear, the City, in citing Central Radio, appears to have applied the 60-square-foot limit applicable to the "commercial sale event/new business/grand opening" category.  The district court echoed that conclusion in its order.  J.A. 1203, 1212-13.

Wall signs allowed in Zone I-1 may be no larger than one square foot of sign area for every linear foot in building frontage facing a public street.  J.A. 276 (§ 16.8-3(c)).  Because Central Radio's building fronts 39th Street, it cannot have a wall sign on the side facing Hampton Boulevard.  J.A. 266 (§ 16-6.8(c)), 276 (§ 16.8-3(c)), 255 (§16-3 (definition of building frontage)).

Finally, because a freestanding sign must be attached to the ground and surrounded by landscaping, Central Radio could not place one on the Hampton Boulevard side of its building, as it would block a fire exit.  J.A. 742:12-743:10; 954:16-955:25.

9

### 1.     The Sign Code's Content-Based Exemptions

Norfolk's sign code exempts certain displays, defined by content, from some of its restrictions.  Some items are exempted from the definition of "sign" itself, leaving them entirely unregulated and, therefore, not subject to the permit requirement and size restriction imposed on Central Radio's banner.  They include "the flag or emblem of any nation, organization of nations, state, city, or any religious organization," as well as "works of art" (so long as they "in no way identify or specifically relate to a product or service").  J.A. 250 (§ 2-3).[4]

Mr. Newcomb—a drafter of the sign code—explained the reason for the government-flag exemption.  He said the code exempts flags because "we believe that's the right thing to do."  J.A. 1012:17-18.  When asked to explain why the law allowed an American flag of unlimited size but strictly limited the size of a Washington Redskins flag, he replied, "I think we consider the importance of an American flag or a state flag to far exceed that of an enthusiastic sports flag."  J.A. 1013:11-13.

As for the "work of art" exemption, the sign code does not define that term, nor explain what constitutes "art."  The record, however, provides some insight. Mr. Duke testified that "if Central Radio wanted to cover the side of their building

---

[4] There are numerous other content-based categories that although considered "signs," are nevertheless exempt from some or all of the code's restrictions.  *E.g.*, J.A. 261 (§ 16-5.2(a)-(b)).

… with a copy of the U.S. Constitution," then, "[p]otentially, that could be construed as art, in which case it would be exempt from the sign regulations." J.A. 700:4-11. But Central Radio's banner, protesting a violation of the Constitution, does not qualify.

### 2.    Norfolk's Allowance Of Other Oversized Signs

Despite Norfolk's decision to restrict Central Radio's banner to 60 square feet, it virtually never enforces the sign code's size restrictions and instead simply ignores other oversized signs in the city. In the five years before Central Radio displayed its banner, the City issued only one citation for a violation of its size restrictions—for a commercial sign in 2010. J.A. 102. Code enforcement is entirely "complaint-driven," J.A. 946:3-4—the City will only enforce the sign code if someone complains. J.A. 758:4-5; 668:4-5. In the case of Central Radio's banner, nobody other than the ODU Real Estate Foundation complained. J.A. 946:13-15.

The lack of enforcement is not due to a lack of violations. To the contrary, many prominent buildings displayed signs that were just as large, if not larger, than Central Radio's. *See* J.A. 58-99.

Some of these were on the City's own buildings. J.A. 1204; *see also* J.A. 63, 83, 85, 87. Only *after* Central Radio sued did Mr. Duke begin addressing these oversized, City-owned signs. *See* J.A. 758:6-13. He explained why in an email to

11

City staff and in his deposition:  the City "need[s] to be sure that what they're putting up is in compliance with city code because people are watching," J.A. 762:3-5; "[t]he plaintiffs are noting the City's failure to comply with its own regulations."  J.A. 120.

Until that point, the City did not feel compelled to follow its own sign code. For example, the code requires that the City's "public event banners" be displayed in accordance with "City guidelines."  J.A. 279 (§ 16-8.6(a)).  When asked if he could "explain what the city guidelines are for allowing public event banners," Mr. Duke responded, "I cannot."  J.A. 756:15-17.  Asked if the guidelines "exist somewhere," he answered, "I assume they existed at some point, yes."  J.A. 756:24-25.  And when asked if he was "aware of the City ever enforcing these city guidelines while you have been working for the City," he answered, "No."  J.A. 757:15-18; *see also* J.A. 757:19-21.

Such non-enforcement of other oversized signs was not just an oversight; it was intentional.  For example, the Nauticus museum has a massive flashing message board larger than the code permits.  J.A. 81; 766:16-20.  Mr. Duke explained that he allowed this sign to remain because "the then city manager directed that I ignore it."  J.A. 766:23-24; 767:7-11.

Similar non-enforcement has occurred on other occasions.  Approximately three years ago, the City Attorney's Office directed the Planning Department to

12

cease prosecuting the signs of an abortion protestor, despite the fact that they violated a public-right-of-way provision of the City Code. J.A. 1067:9-1069:24. And ten days after Election Day in 2012, Mr. Duke told Inspector Garrett to ignore a sign urging President Obama's defeat, even though the City had received a complaint and the sign code requires that campaign signs be removed three days after the election. J.A. 150, 272 (§ 16-6.16); 1125:16-1128:1.

**D.    The Current Status Of Central Radio's Banner**

After the district court denied Central Radio a preliminary injunction, the City alerted Central Radio that it would be prosecuted if it did not remove the banner. J.A. 185. Rather than face misdemeanor convictions and $1,000-daily fines, *see* Norfolk, Va., Code app. A, § 23-4.1, Central Radio covered the banner with a tarp on August 7, 2012. J.A. 152.

In October 2012, Central Radio applied for a sign certificate for a 60-square-foot display on the Hampton Boulevard side of the building. Because 60 square feet is too small to legibly display the original banner's complete message, it sought to display only the portion with the anti-eminent-domain-abuse symbol. City officials conferred for "hours" before deciding to allow it. J.A. 39, ¶7; 723:25. Despite the original citation requiring a sign certificate for even a 60-square-foot sign, Mr. Newcomb informed Bob Wilson that Central Radio did not need a certificate for the proposed display. J.A. 39, ¶8; 973:1-11. When asked

13

why, Mr. Newcomb refused to explain.  J.A. 39, ¶8.  Central Radio accordingly cut out a 60-square-foot section of the tarp to reveal the anti-eminent-domain-abuse symbol but kept the remainder of the banner covered.

During this time, the underlying eminent domain issue was still being litigated.  In fact, a year would pass before the Virginia Supreme Court rendered its decision.  During that entire period—the most critical juncture in Central Radio's fight to protect its property—the City deprived Central Radio of its free-speech rights.  Finally, on September 12, 2013, the Virginia Supreme Court ruled the NRHA could not seize Central Radio's property.

Although its property rights have now been vindicated, Central Radio still seeks to vindicate its free-speech rights.

## VI.    SUMMARY OF ARGUMENT

This case concerns Norfolk's attempt to silence speech that is at the very core of the First Amendment:  protest of unlawful government conduct.  Central Radio displayed its protest banner on the very property the government was trying to illegally seize and convey to Old Dominion.  The City's response was to silence Central Radio, at the behest of Old Dominion, using a permit requirement and size restriction that it did not apply to other signs even larger than Central Radio's— including the City's own signs.

14

The sign-code provisions that were applied to Central Radio's banner are content-based. They exempt such things as government flags and emblems, religious flags and emblems, and "works of art" from *all* regulation, while severely restricting Central Radio's ability to protest governmental abuse. Such exemptions and the underlying regulations to which they pertain are content-based under this Court's precedent and should have been subjected to strict scrutiny, which they undoubtedly fail.

Even as content-neutral restrictions subject to intermediate scrutiny, the sign-code provisions fail to meet constitutional muster. When the government restricts speech, it has to justify its actions with real evidence. Norfolk, however, offered *no* evidence to support its sign-code provisions or its supposed need to silence Central Radio. That should have been fatal for Norfolk, but the district court instead flipped the First Amendment burden, holding that Central Radio did not prove the provisions *fail* intermediate scrutiny. That misapplication of the relevant burden alone is grounds for reversal. Nevertheless, Central Radio did offer overwhelming evidence proving that Norfolk's sign-code provisions do not advance its purported interests in traffic safety and aesthetics, are not narrowly tailored, and do not leave open ample alternative channels of communication.

Norfolk's sign code also effects an unconstitutional prior restraint on speech. Its sign-permit requirement is standardless and lacks a time limit within which the

permitting official must act. These failures create an impermissible risk that the official will resolve an application based on the content of the proposed sign or indefinitely suppress disfavored speech.

Finally, the evidence demonstrates that Norfolk selectively enforced the sign-code provisions against Central Radio in violation of the First and Fourteenth Amendments. While it applied the sign code to Central Radio's protest, it ignored other comparably-sized signs. The evidence also shows that Norfolk enforced against Central Radio for the purpose of suppressing its exercise of First Amendment rights.

For these reasons, this Court should reverse the district court's decision and vindicate Central Radio's free speech rights—just as the Virginia Supreme Court vindicated its property rights in halting the unlawful taking that gave rise to the protest at issue.

## VII.  ARGUMENT

### A.  STANDARD OF REVIEW

This court reviews a grant or denial of summary judgment *de novo*. *M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1992) (en banc). "When *de novo* review is compelled," as it is here, "no form of appellate deference is acceptable." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

16

**B.**    **THE CITY'S SIGN-CODE PROVISIONS VIOLATE FREE SPEECH**

The sign-code provisions the City relied on to suppress Central Radio's protest are content-based restrictions that violate the First Amendment. Even if considered content-neutral, however, they are still unconstitutional.

**1.    The City's Sign-Code Provisions Are Content-Based**

Norfolk's sign-code provisions are content-based. In concluding otherwise, the district court erred in two fundamental respects. First, it ignored the overwhelming body of law holding substantially identical provisions content-based. Second, it misapplied this Court's "practical" approach to the content-neutral/content-based question.

**a.    Courts Reviewing Substantively Identical Sign-Code Provisions Have Found Them Content-Based**

Norfolk's sign code is content-based at its very core—that is, at the definition of "sign" itself. After laying out the meaning of "sign," it exempts a number of content-based categories of speech from the definition and, thus, from all regulation. These exemptions include: (1) "the flag or emblem of any nation, organization of nations, state, city, or any religious organization;" and (2) "works of art which in no way identify or specifically relate to a product or service." J.A. 250 (§ 2-3). Thus, a political-protest banner like Central Radio's is a "sign" subject to permitting and restriction, while a governmental or religious flag or emblem, or a "work of art," escapes regulation entirely.

17

Other courts have struck down, as impermissibly content-based, nearly identical sign-code exemptions for governmental and religious flags and emblems,[5] as well as for works of art.[6] The common problem in these cases is clear: "[T]he exemptions require City officials to examine … content … to determine whether the exemption applies." *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996). Thus, "by any commonsense understanding of the

---

[5] *E.g.*, *Neighborhood Enters., Inc. v. City of St. Louis*, 644 F.3d 728, 736-37 (8th Cir. 2011) ("[n]ational, state, religious, fraternal, professional and civic symbols or crests"), *cert. denied*, 132 S. Ct. 1543 (2012); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1257, 1264, 1268-69 (11th Cir. 2005) ("[f]lags and insignia of any government, religious, charitable, fraternal, or other organization"); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1568, 1572 (11th Cir. 1993) ("flags … represent[ing] a governmental unit or body"); *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 n.2, 249 (9th Cir. 1988) ("[f]lags of the national or state government; or not more than three flags of nonprofit religious, charitable or fraternal organizations"); *Clear Channel Outdoor, Inc. v. Town Bd.*, 352 F. Supp. 2d 297, 301, 309-10 (N.D.N.Y. 2005) ("flag, pennant or insignia of any nation or association of nations or of any state, city or other political unit, or of any political, charitable, educational, philanthropic, civic, professional, or like campaign, drive, movement or event"); *Bonita Media Enters. v. Code Enforcement Bd.*, No. 2:07-cv-411-FtM-29DNF, 2008 WL 423449, at *7, *9 (M.D. Fla. Feb. 13, 2008) ("flags or insignias of 'governmental, religious, charitable, fraternal or other nonprofit organizations'"); *City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 58 n.6, 69-70 (Colo. 1981) ("[f]lags of nations, or an organization of nations, states, cities or fraternal, religious or civic organizations"); *id.* at 70 ("[n]ational, state, religious, fraternal, professional or civic symbols or crests").

[6] *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1331, 1333-34 (M.D. Fla. 2009) ("[a]rt work"). *But see Brown v. Town of Cary*, 706 F.3d 294 (4th Cir. 2013), discussed *infra* Section VIII.B.1.b.

term," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993), the exemptions are content-based.

Admittedly, however, this Court has dismissed the approach that some of these cases take to the content-based/content-neutral question as "absolutist" and "syllogistic." *See Brown*, 706 F.3d at 302; *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012). This Court instead applies what it calls a "practical," or "pragmatic," test that requires evidence of "censorial intent." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 556 (4th Cir. 2013).

Central Radio respectfully submits that this Court's insistence on censorial intent does not comport with Supreme Court precedent "expressly reject[ing] the argument that discriminatory … treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas." *Discovery Network*, 507 U.S. at 429 (omission in original; internal quotation marks and citation omitted); *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642-43 (1994) ("[W]hile a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases."). Central Radio further submits that the approach followed by other courts, including the Eighth and Eleventh Circuits, in reviewing municipal sign codes is correct. *See Neighborhood Enters.*, 644 F.3d at 736 (holding sign ordinance exemptions content-based since "one must look at the *content* of the object"), *cert.*

19

*denied*, 132 S. Ct. 1543 (2012); *see also Solantic*, 410 F.3d at 1259-

66. Accordingly, Central Radio preserves, for *en banc* and Supreme Court review,

the argument that "[a] regulatory scheme that requires the government to examine

the content of the message that is conveyed is content-based regardless of its

motivating purpose." *Serv. Emps. Int'l Union, Local 5 v. City of Houston*, 595

F.3d 588, 596 (5th Cir. 2010) (internal quotations omitted).

### b. Even Under This Court's "Practical" Approach, The Sign Code Is Content-Based

Even under this Court's "practical" approach to the content-based/content-

neutral question, however, Norfolk's sign code is content-based and subject to

strict scrutiny. In *Brown*, this Court held that "it is clear" a "public art" exemption

"distinguishes content" and that "exceptions for signs such as 'religious symbols'"

likewise distinguish content. *Brown*, 706 F.3d at 303 (quoting *Metromedia v. City*

*of San Diego*, 453 U.S. 490, 494-95, 514 (1981)).

"Having determined that the Ordinance's speech restriction[s] [are] based on

… content distinction[s], [this Court's] pragmatic approach asks next whether the

City has distinguished [speech] *because* of its content … and is consequently

content-based." *Clatterbuck*, 708 F.3d at 556 (final alteration in original; internal

quotation marks and citation omitted). "In deciphering censorial intent, [this

Court] look[s] to the relationship—or lack thereof—between the content

distinction and the legislative end." *Id.* (internal quotation marks and citation

omitted).  Specifically, it "examine[s] whether the government's content-neutral justification reasonably comports with the content distinction on the face of the regulation."  *Id.*; *see also Brown*, 706 F.3d at 304.

Here, the City's asserted content-neutral justifications do not reasonably comport with the content distinctions it has drawn.  For example, there is no content-neutral justification for exempting "the flag or emblem of any nation, organization of nations, state, city, or any religious organization" from the definition of "sign"—and, thus, from *all* regulation—while subjecting a banner like Central Radio's to restrictive size and permit requirements.  In concluding otherwise, the district court reasoned that flags and emblems "are commonly designed to be aesthetically pleasing" and "[m]ost … either lack text or present text that is superfluous to the display," thus being "less likely to distract drivers." J.A. 1209.  The district court's reasoning fails for three reasons.

First, it is false.  Of the five states in this Circuit, for example, three— Virginia, North Carolina, and West Virginia—have flags with text.  So, too, does the seal, or "emblem," of the City of Norfolk.  And most Virginians would surely recoil at the suggestion that their flag's admonition to tyrants is merely "superfluous."  *Id.*

Second, the district court mischaracterized what the exemption actually exempts.  It does not exempt all "flags" and "emblems"—it exempts only flags and

21

emblems of a "nation, organization of nations, state, city, or any religious organization." J.A. 250 (§ 2-3). So although an enormous flag of the United States or Virginia, or a massive United Nations symbol or seal of the City of Norfolk, is allowed without restriction, the same is not true of the POW/MIA or Gadsden flag. *See* J.A. 1011:18-1012:10. A massive Salvation Army shield is allowed; not so the Red Cross. And while a rabid Notre Dame fan can proudly drape the side of his building with the flag of Our Lady's university, the rabid Duke fan must keep his Blue Devil flag inside. Such distinctions do not "reasonably comport[]" with the City's asserted traffic-safety and aesthetic justifications. *Clatterbuck*, 708 F.3d at 556. The Gadsden and POW/MIA flags are no less aesthetically pleasing than the Virginia flag or Norfolk seal; the words "Don't tread on me" and "You are not forgotten" are no more a threat to traffic safety than "Sic semper tyrannis" and "Et terra et mare divitiae tuae."

Third, Mr. Newcomb—one of the authors of the sign code, J.A. 790:1-15, testified that these content distinctions exist precisely because Norfolk believes certain messages are more important and should be treated more favorably: "Why do we create exemptions for government flags, is that what you're asking? Because I believe we believe that's the right thing to do.…I think we consider the importance of an American flag or a state flag to far exceed that of an enthusiastic sports flag." J.A. 1012:15-18; 1013:11-13. That is content discrimination, plain

and simple, and the very type of regulation this Court has admonished governments against:  "What governments may generally not do, however, is suppress, disadvantage, or impose differential burdens upon speech because of its content." *Brown*, 706 F.3d at 301 (internal quotation marks and citation omitted); *see also Discovery Network*, 507 U.S. at 429-30 ("[T]here is no justification for that particular regulation other than the city's naked assertion that commercial speech has 'low value.'  It is the absence of a neutral justification for its selective ban … that prevents the city from defending it[] … as content neutral.").

And what is the result of Norfolk's content-based regulations?  Central Radio may display a large governmental flag or seal on its building exhibiting national, state, or local pride, but it may not display a similarly-sized protest critical of national, state, or, in this case, local policy.  There is no content-neutral justification for such a perverse result, and courts striking down sign codes with similar governmental- and/or religious-flag exemptions have emphasized this type of content-based mischief.  *E.g.*, *Solantic*, 410 F.3d at 1264 ("[E]xemption (3) applies to flags and insignia only of a 'government, religious, charitable, fraternal, or other organization.'  Thus, a government or religious organization seeking to fly its flag may do so freely, whereas an individual seeking to fly a flag bearing an emblem of his or her own choosing would have to apply for a permit to do so, and

23

would have to abide by all of the restrictions …."); *see also Dimmitt*, 985 F.2d at 1569; *Clear Channel Outdoor*, 352 F. Supp. 2d at 301, 310.

Norfolk's exemption for "works of art" is likewise content-based under this Court's "practical" approach.  As noted above, *Brown* held that "it is clear" a "public art" exemption "distinguishes content."  *Brown*, 706 F.3d at 303.  The Court nevertheless held Cary's "public art" exemption content-neutral, explaining that "it is reasonable to presume public art … enhance[s] rather than harm[s] aesthetic appeal."  *Id.* at 304.

Assuming an aesthetic interest can support a restriction of political speech on private property,[7] there are two critical differences between the "public artwork" exemption in *Brown* and the "work of art" exemption here.  First, in *Brown*, the sign code *defined* the term "public art," and to fit within that definition, an item had to have been produced for the *purpose* of enhancing the town's aesthetics—that is, to further the town's content-neutral interest.  Specifically, it had to be "'intended to beautify or provide aesthetic influences to public areas or areas which are visible from the public realm.'"  *Id.* at 298.  Here, on the other hand, Norfolk has *no* definition of "work of art."  There is only the whim of City

---

[7] *See Goward v. Minneapolis*, 456 N.W.2d 460, 467 (Minn. Ct. App. 1990) ("The Supreme Court has never held that aesthetic interests alone can constitute a governmental interest significant enough to override political speech on property owned by the speaker.  We hold it cannot.").

administrators, who are free to allow or disallow potential "art" for *any* reason, aesthetic or not—indeed, for no reason at all. And while the district court here baldly asserted that "artwork" is "commonly designed to be aesthetically pleasing," J.A. 1209, this Court has held that "asserting an interest in aesthetics …, without more, isn't sufficient to … permit the restriction of protected expression." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 579 (4th Cir. 2010) (omissions in original; internal quotation marks and citation omitted).

The second critical distinction between this case and *Brown* is that, in *Brown*, there was no evidence that the "art work" exemption was applied in a content-based manner. Here, there is. According to the City, "a copy of the U.S. Constitution … cover[ing] the entire side of" Central Radio's building could be allowed as a "work of art," but Central Radio's banner, protesting Norfolk's violation of the Constitution, is not. J.A. 700:4-11. Once again, there is no content-neutral justification for such an absurd result. There is no reason to believe—much less evidence to suggest—that Central Radio's banner (or any other large sign, for that matter) is less aesthetically appealing, or presents more of a threat to traffic, than a massive copy of the Constitution draped over a building. The distinctions drawn by Norfolk simply do not "bear a reasonable relationship to the … asserted content neutral purposes" of traffic safety and aesthetics. *Brown*, 706 F.3d at 304.

25

A recent federal decision concerning a similar "art" exemption came to the same conclusion.  In *Complete Angler, LLC v. City of Clearwater*, a business displayed a large painting and banner containing noncommercial speech, including a protest.  607 F. Supp. 2d at 1329-30.  The business was cited for failing to obtain a permit and for exceeding the applicable size limit.  *Id.* at 1329-30, 1331.  As here, however, the code contained an exemption for "art work," which the court held was content-based in its application:

> [The city] itself has provided evidence that it would have tolerated the Painting and/or the Banner had they contained alternate content.  [The city's] "spokeswoman" is quoted in a local newspaper as stating that the Painting is considered commercial "signage" but "a mural of kids playing in a park … would be acceptable".  As for the Banner, [the city's] Planning Director testified that he believed a banner of the same size and material displaying the American Flag would not have violated the Code.

*Id.* at 1333 (first omission in original; footnotes and citations omitted).  The court accordingly applied strict scrutiny and enjoined the city from applying the underlying permit requirement and size restriction to the banner and painting.  *Id.* at 1336.

This court should do the same.  The exemptions for governmental and religious flags and emblems, as well as for "works of art," are content-based even under this Court's "practical" approach to content-neutrality.  They, along with the

26

underlying size restriction and permit requirement,[8] should therefore be subjected to strict scrutiny.

### 2. The Sign-Code Provisions Fail Strict Scrutiny

"If [a] regulation is content-based," this Court applies strict scrutiny and "may uphold the regulation only if it is the least restrictive means available to further a compelling government interest." *Clatterbuck*, 708 F.3d at 555 (citations omitted).[9] The City cannot meet that burden—in fact, it did not even attempt to in the district court.

First, the governmental interests the City relies on—"traffic safety and aesthetics," J.A. 1209—"have never been held to be compelling," *Neighborhood Enters.*, 644 F.3d at 737-38 (internal quotation marks and citation omitted), and are therefore "insufficient to survive strict scrutiny." *Midwest Media Property, L.L.C. v. Symmes Twp.*, 503 F.3d 456, 477 (6th Cir. 2007).

But even assuming traffic safety and aesthetics *were* compelling interests, Norfolk must also prove the sign-code provisions are "the *least restrictive* means

---

[8] *See Nat'l Adver.*, 861 F.2d at 249 ("Because the exceptions to the restriction … are based on content, the restriction itself is based on content."); *Lusk v. Village of Cold Spring*, 418 F. Supp. 2d 314, 324 (S.D.N.Y. 2005) ("[B]ecause Chapter 134 defines the word 'sign' as it does, the regulations on the posting of 'signs' … are unconstitutional…."), *rev'd in part on other grounds*, 475 F.3d 480 (2d Cir. 2007).

[9] Strict scrutiny is also appropriate because the sign code burdens core political speech. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, __ U.S. __, 131 S. Ct. 2806, 2816-17 (2011).

27

available to further" those interests. *Clatterbuck*, 708 F.3d at 555 (emphasis added). Norfolk cannot do so when it has no evidence that Central Radio's banner even *impacts* those interests. *See* J.A. 166-67 (acknowledging, in interrogatory response, that City was unaware of "any safety problems with [Central Radio's] sign"); J.A. 982:16-19; 1008:4 (deposition of Mr. Newcomb: testifying that the text on Central Radio's banner is "very readable" and is not "a great issue for traffic"); J.A. 628:7-10 (deposition of Mr. Duke: "Q.… Has anybody ever expressed that Central Radio's banner posed an aesthetic problem?" A. No."). Moreover, any claim that the sign code's restrictions are necessary to achieve a compelling interest is undercut by their under-inclusivity: if aesthetics can be compromised, and motorists distracted, by Central Radio's banner—a dubious and unsupported proposition—then they may be "just as compromised, and … just as distracted, by displays of governmental [or] religious … flags," or works of art. *Lusk*, 418 F. Supp. 2d at 324; *see also Neighborhood Enters.*, 644 F.3d at 738; *Clear Channel Outdoor*, 352 F. Supp. 2d at 310.

In short, the sign-code provisions cannot survive strict scrutiny. They are therefore unconstitutional.

### 3. The City's Sign-Code Provisions Fail Intermediate Scrutiny

Even if this Court concludes the sign-code provisions are content-neutral, however, they still fail constitutional muster. Such restrictions are only valid if the

28

government proves they survive intermediate scrutiny: that is, if they "further[] a substantial government interest, [are] narrowly tailored to further that interest, and leave[] open ample alternative channels of communication." *Am. Legion Post 7 v. City of Durham*, 239 F.3d 601, 609 (4th Cir. 2001).[10] The sign-code provisions do not satisfy that standard.

### a. The City Has The Burden To Prove The Sign-Code Provisions Survive Intermediate Scrutiny

As an initial matter, the district court erred in allocating the burden under intermediate scrutiny. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000). Here, however, the district court required Central Radio to prove the sign code *fails* intermediate scrutiny. For example, the court faulted Central Radio for "present[ing] no evidence that the Sign Code, on its face, is overbroad or fails to leave open ample alternative channels of communication," all the while allowing Norfolk to rely on "arguments based solely on logic or common sense." J.A. 1211 (internal quotation marks and citation omitted); *see also* J.A. 1211-1212 ("Although Plaintiffs have presented some evidence suggesting that signs like theirs pose no threat to traffic safety, this

---

[10] This standard is the same for facial and as-applied challenges. *Indep. News, Inc. v. City of Charlotte*, 568 F.3d 148, 155 n.3 (4th Cir. 2009).

evidence is insufficient to render the City's conclusion to the contrary unreasonable.").

The district court's approach conflicts with precedent that requires the government to proffer actual evidence to prove constitutionality—as this Court has put it, "to come forward with a strong factual justification for its action." *Davenport v. City of Alexandria*, 710 F.2d 148, 152 n.8 (4th Cir. 1983) (en banc); *see also Edenfield v. Fane*, 507 U.S. 761, 771 (1993). Indeed, the Supreme Court "has never accepted mere conjecture as adequate to carry a First Amendment burden." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000); *see also Turner Broad. Sys.*, 512 U.S. at 664 (plurality).

In absolving the City of its evidentiary burden, the district court erroneously relied on this Court's statement in *News & Observer* that "arguments based solely on logic or common sense normally are allowed." 597 F.3d at 577. That statement has no applicability here. The regulation at issue in that case concerned the use of a nonpublic forum—that is, "[p]ublic property which is not by tradition or designation a forum for public communication." *Id.* (internal quotation marks and citation omitted). It was *not* a regulation of speech on private property. That distinction is critical, because the level of scrutiny applicable in a nonpublic forum case is far lower—and far more deferential to the government—than intermediate scrutiny. Under the former, the government need only show that its regulation is

30

"reasonable" and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* Under the latter, the government must prove that the regulation "furthers a substantial government interest, is narrowly tailored to further that interest, and leaves open ample alternative channels of communication." *Am. Legion Post 7*, 239 F.3d at 609. "Common sense" and "logic" may[11] suffice under the former standard but not under the latter.

In fact, the cases that *News & Observer* relied on make clear that they pertain only to regulations of nonpublic fora. The first, *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983), held that a lack of evidence supporting the government's "reasonableness" argument was not fatal because "[w]e have not required that such proof be present to justify *the denial of access to a non-public forum*." *Id.* at 52 n.12 (emphasis added). The other, *Multimedia Publishing Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport District*, 991 F.2d 154 (4th Cir. 1993), was also a nonpublic forum case. In holding that the government could "appeal[] to common sense and logic," *id.* at 160, it relied on *Perry Education Association*, as well as the plurality's statement in *United States v. Kokinda*, 497 U.S. 720 (1990) (plurality), that "common-sense … is sufficient … to uphold a regulation *under*

---

[11] *News & Observer* held that appeals to "common sense" or "logic" are *not* enough, even in a nonpublic forum case, when the asserted governmental interest is aesthetics. 597 F.3d at 579.

31

*reasonableness review*." *Id.* at 734-35 (emphasis added; internal quotation marks and citation omitted).

Here, on the other hand, Norfolk was required to proffer actual, objective evidence to support the sign-code provisions, which it failed to do. *See Horina v. City of Granite City*, 538 F.3d 624, 633-34 (7th Cir. 2008) ("[W]e have struck down time, place, and manner restrictions where the government failed to produce 'objective evidence' showing that the restrictions served the interests asserted."); *Pagan v. Fruchey*, 492 F.3d 766, 774 (6th Cir. 2007) (en banc).

### b. The Restrictions Applied To Central Radio's Banner Do Not Serve A Substantial Governmental Interest

Norfolk did not prove its regulations "further[] a substantial government interest." *Am. Legion Post 7*, 239 F.3d at 609. Even assuming the claimed interests in traffic safety and aesthetics are substantial,[12] "merely invoking [them] is insufficient. The [City] must also show that the proposed communicative activity endangers those interests." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 859 (9th Cir. 2004) (citation omitted). Here, it made no such showing.

The City proffered no evidence to substantiate the supposed harm that Central Radio's banner poses. In fact, it *admitted* it was "not aware of any safety problems with the sign." J.A. 166-67. Mr. Newcomb, the City's designated

---

[12] *See supra* note 7.

32

witness on the Central Radio investigation, acknowledged that the text was "very readable" and that he did not think it was "a great issue for traffic."  J.A. 982:19; 1008:4.  And there is a similar absence of evidence concerning the supposed aesthetic threat.  When asked, "Has anybody ever expressed that Central Radio's banner posed an aesthetic problem?" Mr. Duke, the City's zoning administrator, answered plainly, "No."  J.A. 628:7-9.

Nor did the City present evidence of any problems posed by large signs more generally.  Mr. Duke testified that he was "[n]ot … aware of" any "evidence of large banners ever causing …safety problems."  J.A. 627:5-10.  Mr. Newcomb testified similarly.  *See* J.A. 818:6-13.

Other record evidence confirms the testimony of Messrs. Duke and Newcomb.  For example, *The Signage Sourcebook*, published by the U.S. Small Business Administration, summarized a number of empirical studies relating to signage and concluded that "perhaps no myth about signs has enjoyed a greater level of acceptance than the myth that business signs cause traffic accidents."  J.A. 194; *see also* J.A. 189 (statement of Executive Secretary of the Institute of Traffic Engineers:  "Facts … indicate no significant relationship between outdoor advertising and the occurrence of traffic accidents.").

In short, the supposed problems posed by Central Radio's banner (or signs more generally) are nothing more than unsupported conjecture, which is "*verboten*

33

in the First Amendment context." *Horina*, 538 F.3d at 633. In the absence of actual evidence, Norfolk may not rely on traffic safety and aesthetics interests to justify the sign-code restrictions. *See Arlington Cnty. Republican Comm. v. Arlington Cnty.*, 983 F.2d 587, 594 (4th Cir. 1993) (striking down two-sign limit on temporary signs where "County could not show any specific aesthetic or traffic problems arising" from such signs); *Pagan*, 492 F.3d at 774 (holding regulation of "for sale" signs unconstitutional "in the absence of evidence of concrete harm"); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1039 (7th Cir. 2002) (holding peddling ban unconstitutional because city "provided no objective evidence that traffic flow on the sidewalk or street is disrupted when [plaintiff] sells his book").

Even if Central Radio's banner did somehow threaten governmental interests, the City still failed to "produce 'objective evidence' showing that [its] restrictions *serve[]* th[ose] interests." *Horina*, 538 F.3d at 634 (emphasis added). The fact that the City has chosen not to enforce its regulations against other oversized signs undermines any claim that the regulations serve its asserted interests.

For example, the City refused to enforce the size restriction against "an oversized flashing message board" at the Nauticus museum. J.A. 1213. This fact is particularly damning to the "traffic safety and aesthetics" assertion. After all, the City is well aware of the sign and its noncompliance with the code, *see* J.A.

766:16-20, and it has maintained that flashing signs create unique safety issues. J.A. 822:1-9 (noting that "flashing signs … have caused concerns to … police officers"). Nevertheless, it has not enforced the size restriction against the Nauticus sign. When asked why, Mr. Duke testified, "Because the then city manager directed that I ignore it." J.A. 766:21-24. The fact that the City does not enforce—indeed, has directed its staff to "*ignore*"—the size restriction when it comes to such a sign "raises serious doubts about whether [the City] is, in fact, serving, with th[e size restriction], the significant interests which [it] invokes." *Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

Central Radio presented evidence of other oversized signs throughout Norfolk, including public-event banners on the City's *own* buildings. J.A. 1204; *see also* J.A. 58-99. Even though the sign code requires the City to follow "City guidelines" in displaying such banners, J.A. 278 (§ 16-8.6(a)), Mr. Duke testified that he was unaware of whether the guidelines were ever enforced or if they even existed. J.A. 756:15-25; 757:15-21. And although the City finally took action with respect to some of these signs, it did so only after Central Radio filed its lawsuit, J.A. 1204, 1025:17-1026:21—not because it suddenly realized there was some genuine traffic safety or aesthetic issue, but because, in Mr. Duke's words, Central Radio had filed "a lawsuit … noting the City's failure to comply with its own regulations" and "people are watching." J.A. 120; 762:2-5.

The City's willingness to ignore oversized signs until its hand is forced—or it receives a complaint from a high-powered institution like ODU—again raises serious doubts about the governmental interests purportedly underlying the regulation.

Notwithstanding the complete absence of evidence proffered by Norfolk and the considerable evidence proffered by Central Radio, the district court erroneously concluded that "the Sign Code serves the substantial government interests of traffic safety and aesthetics." J.A. 1211. In so concluding, the court relied entirely on a single assertion—"there is evidence that some drivers have been distracted by Central Radio's banner," J.A. 1212—that is both factually wrong and constitutionally irrelevant. The "evidence" the court cited was merely a statement by Bob Wilson that, in response to the banner, passersby would "honk their horns, yell things in support to us, wave." J.A. 304:12-16.

Expressions of support are not evidence of distraction; they are evidence of *agreement*. This was not a situation where drivers were distracted by the *medium* in which a message was conveyed—for example, bright, flashing lights or bright fluorescent lettering.[13] Rather, it was a situation in which passersby *agreed* with

---

[13] *See, e.g.*, J.A. 822:1-10 (noting that "flashing signs … have caused concerns to … police officers"); *Brown*, 706 F.3d at 305 (discussing evidence that "bright fluorescent lettering" had "distracted both a … police officer and a passing motorist").

36

Central Radio's position and voiced their support.  Speech may not be "regulate[d]

on the basis of … its persuasive (or repellant) force."  *R.A.V. v. City of St. Paul*,

505 U.S. 377, 394 n.7 (1992).

In short, Norfolk was required to "proffer *something* showing that [its]

restriction[s] actually serve[] a government interest."  *Horina*, 538 F.3d at 633-34.

It proffered nothing.

      **c.**    **The Restrictions Applied To Central Radio's Banner Are Not Narrowly Tailored**

Even if the sign-code provisions do serve a substantial governmental

interest, however, they still fail intermediate scrutiny because the City never

proved they are narrowly tailored.  A regulation is "narrowly tailored" if it:  (1)

"promotes a substantial government interest that would be achieved less effectively

absent the regulation"; and (2) does not "burden substantially more speech than is

necessary to further" that interest.  *Ward v. Rock Against Racism*, 491 U.S. 781,

799 (1989) (internal quotation marks omitted).  Here, neither requirement is

satisfied.

First, the City proffered—and the district court cited—no evidence that any

substantial interest the City may have in traffic safety or aesthetics "would be

achieved less effectively absent the" size restriction.  *Id.* (internal quotation marks

omitted).  Indeed, the City would have been hard-pressed to make such a showing:

because Norfolk presented no evidence that Central Radio's banner had *any* impact

37

on traffic safety and aesthetics, it cannot show that those interests would be achieved less effectively absent the size restriction.

Second, the sign-code provisions "burden substantially more speech than is necessary," *id.*, because they "do[] not sufficiently match [the City's] stated interest[s]." *Kuba*, 387 F.3d at 862 (internal quotation marks omitted). For example, Norfolk claims traffic safety and aesthetics necessitate requiring a permit for Central Radio's banner and restricting it to 60 square feet (or some other unspecified size[14]), yet it allows other items—*e.g.*, "works of art," "flags or emblems of" any government or religious organization, "festival banners," and "murals"—to be erected *without* a permit and to be of *unlimited* size. *See* J.A. 250 (§ 2-3 (definition of "sign")); 261 (§ 16-5.2(a)(3), (9), (10)). This mismatch between the asserted interests and the restrictions demonstrates a lack of tailoring.

In nevertheless concluding the sign-code provisions are narrowly tailored, the district court faulted Central Radio for "present[ing] no evidence that the Sign Code, on its face, is overbroad." J.A. 1211 (internal quotation marks and citation omitted). It was not Central Radio's burden to prove the sign code is overbroad; it was Norfolk's burden to prove it is narrowly tailored … and Norfolk failed. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1204 (9th Cir. 2009) (holding, under

---

[14] *See* J.A. 682:5-10 (testifying, when asked the size limit for Central Radio's banner, "We have never reached a final decision on that … question.").

38

intermediate scrutiny, that leafleting regulation was not narrowly tailored because "the City ha[d] not provided any evidence that placing leaflets on parked cars results in any litter, much less a more-than-minimal amount of additional litter"); *Krantz v. City of Fort Smith*, 160 F.3d 1214, 1222 (8th Cir. 1998).

> ### d.    The Restrictions On Central Radio's Banner Do Not Leave Open Ample And Adequate Alternatives

Finally, even if the sign-code provisions are narrowly-tailored to serve a substantial governmental interest, they still fail to "leave[] open ample alternative channels [for] communication" of the information Central Radio seeks to convey. *Am. Legion Post 7*, 239 F.3d at 609. It was the City's burden to show "that the alternatives left open to [Central Radio] are ample and adequate." *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1557 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987). The district court, however, again got the burden wrong, faulting Central Radio for "present[ing] no evidence that the Sign Code, on its face, … *fails* to leave open ample alternative channels of communication." J.A. 1211 (emphasis added).

In any event, Central Radio *did* demonstrate how the sign code left it with no "reasonable alternative avenues of communication." *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010). While the district court simply assumed that displaying a far smaller sign—"a sixty-square-foot banner"—would be ample and adequate, J.A. 1212-13, Central Radio explained that to avail itself of that

39

alternative, it would have to either (1) change the content of its message or (2) drastically reduce the banner's font size to the point that it would be illegible from Hampton Boulevard.

Neither option is adequate. "The First Amendment protects [Central Radio's] right not only to advocate [its] cause but also to select what [it] believe[s] to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988); *see also FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 477 n.9 (2007) (opinion of Roberts, C.J.) (rejecting argument that a law can require speakers to change the content of their speech: "That argument is akin to telling Cohen that he cannot wear his jacket because he is free to wear one that says 'I disagree with the draft.'"). Thus, an alternative is only "ample" and "adequate" if it "is accessible and [capable of reaching] where the intended audience is expected to pass." *Students Against Apartheid Coal. v. O'Neil*, 660 F. Supp. 333, 339 (W.D. Va. 1987). Here, Central Radio's message is to the city and state at large—even those citizens not necessarily seeking information regarding eminent domain abuse. *See* J.A. 305:2-3 ("We are trying to reach every citizen of Virginia that doesn't know what eminent domain is and the abuse of it."). It therefore intentionally designed its banner to be visible by the thousands of people who pass by Central Radio's property every day. *See* J.A. 304:17-24. The message is most effectively—indeed, only effectively—expressed by a large banner on the side of Central Radio's

40

property most visible to the public.  *See Linmark Assocs., Inc. v. Willingboro*, 431

U.S. 85, 93 (1977) (noting alternatives may be inadequate if they "are less likely to

reach persons not deliberately seeking [the] information").[15]

The district court suggested that alternatives "other than signage" might also

be available, but it identified none.  J.A. 1212.  And for good reason:  the Supreme

Court has admonished that a sign on one's own property is "an unusually cheap

and convenient form of communication" that often has "no practical substitute."

*City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994).

More fundamentally, however, any alternative other than a sign on Central

Radio's building would deprive Central Radio of the communicative impact of its

banner, as the banner's message is uniquely tied to the building itself.  The

Supreme Court has stressed how important location is to message, especially in the

context of a political-protest sign.  *See id.* at 56 ("Displaying a sign from one's

own residence often carries a message quite distinct from placing the same sign

someplace else, or conveying the same text or picture by other means.  Precisely

because of their location, such signs provide information about the identity of the

"speaker." … [T]he identity of the speaker is an important component of many

attempts to persuade.").

---

[15] Indeed, it is disingenuous for Norfolk to suggest a smaller sign when it
elsewhere suggests that reducing font size can *cause* traffic problems.  *See* J.A.
1007:9-22.

The connection between location and message is well illustrated by *Goward v. City of Minneapolis*.  There, a homeowner harmed by a zoning decision protested by displaying signs in his yard reading, among other things, "Drive up the back alley & see what man's inhumanity to man has done to my home."  456 N.W.2d at 462.  The city forced him to remove the signs because of an ordinance prohibiting certain lawn signs.  The court struck down the ordinance for failure to leave open adequate alternatives:

> We think the messages contained on respondent's signs are so closely connected to their location that no adequate alternative means of communication exists.  The signs invite passers by to look at the house, and to consider whether the city treated respondent in a humane fashion.  The same message communicated any place other than the house would carry little impact.

*Id.* at 468.  Numerous other cases similarly stress the importance of location to message.  *E.g.*, *Linmark*, 431 U.S. at 93; *Weinberg*, 310 F.3d at 1042.

As in these cases, the location of Central Radio's banner (a building threatened with eminent domain abuse) was a critical component of the message itself (urging an end to eminent domain abuse).  Protesting eminent domain abuse at the very site of—indeed, on the very object of—that abuse was the *only* adequate means of conveying the message that such abuse is wrong.

Accordingly, even if the sign-code restrictions are assessed as content-neutral time, place or manner restrictions, they fail.

42

**C.    THE SIGN CODE'S CERTIFICATE REQUIREMENT EFFECTS AN UNCONSTITUTIONAL PRIOR RESTRAINT ON CENTRAL RADIO'S SPEECH**

The City's sign code is unconstitutional for another reason:  its sign-certificate requirement effects an impermissible prior restraint.  A law requiring a permit to engage in speech is only allowed if the permitting authority is "bounded by precise and clear standards."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 558 (1975).  Moreover, where such a law is content-based, it must have a time limit for the permitting authority to act on permit applications.  *Covenant Media v. City of N. Charleston*, 493 F.3d 421, 431 (4th Cir. 2007).  Here, the City's permitting scheme contains no standards—much less clear and precise ones—and also no time limit.  It is therefore unconstitutional.

**1.    The Permit Requirement Is Unconstitutional Because It Lacks Standards**

Speech permit requirements that "plac[e] unbridled discretion in the hands of a government official or agency" raise the specter of censorship.  *City of Lakewood v. Plain Dealer Publ'g*, 486 U.S. 750, 757 (1988).  "To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority."  *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (internal quotation marks and citation omitted).  "If the permit scheme" lacks such standards and instead "involves appraisal of facts, the exercise of

43

judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Id.* (internal quotation marks omitted). This is true even if the speech regulation is content-neutral. *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002).

Here, the City has given itself the power to grant or deny permits on standards that are anything but "narrow, objective, and definite." For example, according to Mr. Duke, Central Radio's banner could not receive a sign certificate because it is an oversized "temporary sign." J.A. 680:2-681:17; 694:8-13. The reason the banner is oversized, according to Mr. Duke, is because it contains Central Radio's logo. *E.g.,* J.A. 694:8-20; 698:23–699:8. But when asked what the size limit for such a banner is, Mr. Duke could not provide a clear answer: "We have never reached a final decision on that … question," he explained. J.A. 682:8-9; *see also* J.A. 683:2-4. What would it take to determine the size limit? "I would have to consult with the city attorney's office," Mr. Duke explained, "looking at a multitude of issues." J.A. 682:21-23.

Mr. Duke was then asked whether the banner would be permissible if Central Radio simply removed the logo. He *still* could not provide an answer. *See* J.A. 685:19-686:21; 694:21-695:3; 716:16-723:5. He said this would present

44

"more of a free speech issue," J.A. 723:6-8,[16] but that there is no "black-and-white answer" in the sign code:

> Q.    Do you think there's a clear answer somewhere in the sign code as to whether they can have the current banner without the logo?
>
> A.    I think it's an issue that we would have to deal with and interpret.  But do I think you're going to find a black-and-white answer in the code?  No.

J.A. 719:3-8.  What would it take to determine whether the banner would be allowed?  "[I]nput from the other senior staff, as well as the city attorney's office," Mr. Duke explained.  J.A. 724:20-23; *see also* J.A. 686:8-10.  "We would use Chapter 16, our past experience, what we have done in the past in the ordinance, and legal advice from the city attorneys before we made a final determination." J.A. 719:21-24.

The process Mr. Duke describes is precisely the "appraisal of facts, the exercise of judgment, and the formation of an opinion" that the First Amendment abhors and that the Supreme Court forbids in speech-permitting schemes.  *Forsyth*, 505 U.S. at 131 (internal quotation marks omitted).  The City is neither bridled in its discretion nor bounded by "precise and clear standards."  *Se. Promotions, Ltd.*, 420 U.S. at 553, 558.  Rather, its decisions turn largely on whether or not, in the

---

[16] *See also* J.A. 698:24–699:2 ("Q.…[W]hy is their original 375-square-feet banner not an issue of free speech?  A.  It has their logo on it, so it is advertising their business.  It's commercial.").

45

assessment of its administrators, there is "a free speech issue" with a particular sign.  J.A. 723:6-8.

The district court ignored this evidence.  Instead, it simply asserted, in conclusory fashion, that "the Sign Code specifies what constitutes an acceptable sign," and that "[t]hese standards are based on the signs' 'palpable effects on the surrounding neighborhood,' rather than on the City's approval of their content." J.A. 1215 (quoting *Wag More Dogs*, 680 F.3d at 372).  The court, however, did not identify those supposed "standards" or address the fact that Norfolk's own officials could not identify them.

The fact is there are no standards—much less ones based on "palpable effects" on the neighborhood.  There is only the subjective judgment of City employees based on such things as "past experience," "consultations with other staff," and, ultimately, personal opinion about whether there is "more of a free speech issue" with a particular sign.  J.A. 686:8-10; 719:18-24; 723:6-8.  "[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted" by such an *ad hoc* process.  *Forsyth*, 505 U.S. at 131 (internal quotation marks omitted).

The City's application of the undefined "works of art" provision is even more nebulous.  "Works of art" are exempt from the definition of "sign" and, therefore, from the certificate requirement.  J.A. 250 (§ 2-3).  In concluding

46

Central Radio's banner was subject to the permit requirement, the City necessarily determined it was not a "work of art." *See Complete Angler*, 607 F. Supp. 2d at 1333 ("[I]n concluding that the Painting and the Banner were subject to the permit requirement or spatial constraints, Defendant necessarily … determined that neither was art work … exempted under the Code.").

The sign code, however, provides no definition—much less "narrow, objective, and definite" standards—for determining whether something is or is not a "work of art." That problem is only compounded by the inherent vagueness of the term "art" itself. *See Household Goods Carriers' Bureau v. ICC*, 584 F.2d 437, 440 (D.C. Cir. 1978).[17] Nevertheless, Norfolk has tasked its administrative staff with reviewing potential "signs" and asking, "Is this art?" This consideration "involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority"—the very things the Supreme Court has said are forbidden in the prior-restraint context. *Forsyth*, 505 U.S. at 131 (citation omitted).

_____

[17] In this regard, the definition of "sign," with its exemptions for "art," is also void for vagueness. *See Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Although this Court held in *Brown* that an exemption for "public art" was not unconstitutionally vague, the code at issue in that case, unlike Norfolk's, *defined* the term "public art" and did so in "terms that the ordinary person exercising ordinary common sense c[ould] sufficiently understand and comply with." *Brown*, 706 F.3d at 306.

Significantly, some of history's most effective political protests have taken the form of art. Presumably, Norfolk's zoning officials consider Picasso's *Guernica*, protesting the policies of the Franco government during the Spanish Civil War, or Keith Haring's *Ignorance=Fear*, protesting the policies of the United States government during the AIDS epidemic, to be "art." But Central Radio's banner, protesting the policies of the Norfolk government during its attempt to unlawfully seize private property, does not fit the bill. Why it does not is anyone's guess—or at least the guess of Norfolk's zoning officials.

By giving administrative staff the power to allow or disallow speech based on personal interpretations of wholly undefined terms such as "work of art," or based on the *ad hoc* application of sign-code provisions that yield no "black-and white answer," J.A. 719:3-8, the City's sign-certificate requirement effects an unconstitutional prior restraint on speech.

## 2.     The Permit Requirement Is Unconstitutional Because It Lacks A Time Limit

The permit requirement constitutes an unconstitutional prior restraint for another reason: it lacks a time limit on the decision-making process. As the district court acknowledged, a content-based sign regulation with a permit requirement must contain a time limit for officials to act on applications. J.A. 1214-15. Without such a limit, the regulation "creates the risk of indefinitely suppressing permissible speech." *Covenant Media*, 493 F.3d at 431.

48

Here, it is undisputed that Norfolk's certificate requirement lacks a time limit. *See* J.A. 260-64 (§ 16-5). The district court nevertheless upheld it. J.A. 1214-15. Its sole basis for doing so was its earlier determination that the sign code is content-neutral. As discussed above, that determination was wrong. Wrong, too, was the district court's conclusion that the permit scheme does not require a time limit.

Because of the absence of a time limit, and because Norfolk officials are not "bounded by precise and clear standards" in acting on applications, *Se. Promotions, Ltd.*, 420 U.S. at 553, 558, the permit scheme effects an unconstitutional prior restraint on speech.

## D.     THE CITY SELECTIVELY ENFORCED THE SIGN CODE IN VIOLATION OF THE FOURTEENTH AND FIRST AMENDMENTS

Even if the sign-code provisions themselves do not violate the First Amendment, the City enforces them selectively in violation of the First and Fourteenth Amendments. *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("[T]he enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination."). A plaintiff can prevail on a selective-enforcement claim by showing the enforcement action "had a discriminatory effect and that it was motivated by a discriminatory purpose."

49

*Wayte v. United States*, 470 U.S. 598, 608 (1985).  Here, Central Radio has shown both.[18]

### 1.    The City's Enforcement Of The Sign Code Was Discriminatory In Effect

The evidence proffered by Central Radio demonstrates the discriminatory effect of the City's enforcement practices.  "To establish a discriminatory effect," Central Radio "must show that similarly situated individuals … were not" cited by the City.  *United States v. Armstrong*, 517 U.S. 456, 465 (1996).  It has made that showing:  despite the City's decision to cite Central Radio, threaten it with prosecution, and restrict its political-speech banner to 60 square feet, J.A. 55, 57,

---

[18] The selective-enforcement problem in this case is compounded by the nature of the sign code itself—particularly its uncertain treatment of a sign like Central Radio's banner.  Courts have repeatedly stressed that the mere *possibility* of selective enforcement of a speech regulation can render a law unconstitutional, especially when the risk is that imprecision in the law may allow the government to target messages critical of it:

> [H]istory shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law.  The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility.

*Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991); *see also In re Primus*, 436 U.S. 412, 433 (1978); *Long Island Vietnam Moratorium Comm. v. Cahn*, 437 F.2d 344, 350 (2d Cir. 1970) ("[T]he statute vests … officers with too much arbitrary discretion .… This opportunity for discriminatory selective enforcement … renders the statute unconstitutional.").

50

185, the City allowed oversized and other non-complaint signs to proliferate

throughout Norfolk.  As noted above:

- the Nauticus museum has "an oversized flashing message board"—the type of sign that the City says creates distinct safety problems—yet the city manager directed the Planning Department to "ignore it," J.A. 766:23-24; 1213;

- the City had myriad oversized signs on its *own* buildings, which it only began addressing because of the present lawsuit and the fact that, in Mr. Duke's words, "people are watching," J.A. 63, 83, 85, 87, 120, 762:3-5, 1204;

- an abortion protestor placed illegal signs in the right-of-way in violation of the City Code, yet the City Attorney's Office directed the Planning Department not to enforce against him, J.A. 1067:9-1069:24; and

- a sign urging the defeat of President Obama was displayed beyond the three-day, post-election window for campaign signs, yet Mr. Duke directed his staff to ignore it—despite having received a complaint about it, J.A. 272 (§ 16-6.16), 1127:2-24.

In rejecting Central Radio's selective-enforcement claim, the district court

simply ignored or attempted to discount these examples.  For instance, the court

ignored the oversized signs on City buildings.  It discounted the City' refusal to

cite the anti-abortion protestor with the hair-splitting distinction that the regulation

violated on that occasion was located elsewhere in the City Code—not in the sign

section specifically.  J.A. 1213.  That is a distinction without a difference:  the

signs Norfolk ignored violated a sign regulation that is administered (or not) by the

same City department that cited Central Radio.  J.A. 1068:10-1069:16.  Regarding

the anti-Obama sign, the district court suggested there was some uncertainty as to how the sign should be treated under the sign code.  J.A. 1213 (describing supposed uncertainty as to whether the sign was in fact a "campaign sign").  As discussed below, however, that is a fact that, if true, favors Central Radio—not the City.  Finally, the district court did not even attempt to explain away the oversized flashing-message sign on the Nauticus museum.

In short, the evidence demonstrates numerous occasions on which the City simply ignored non-compliant signs—whether the City's own signs, signs of favored institutions like the Nauticus museum, anti-abortion signs, or anti-Obama signs.[19]  The City only decided to take enforcement seriously when an official from the ODU Real Estate Foundation came calling about a sign that criticized its scheme with the Norfolk Redevelopment and Housing Authority to unlawfully seize private property through eminent domain.  According to the City's chief zoning inspector, who has worked for the City for a *quarter-century*, it was the first time she could recall the City ever having issued a citation—or even a

---

[19] Any one of these examples was sufficient to defeat the City's summary judgment motion.  *See Turner v. Hallberg*, No. 04-276-KI, 2005 WL 2104999, at *6 (D. Or. Aug. 30, 2005) (holding plaintiff's evidence showing City failed to inspect a neighbor's home following a complaint was "enough to create a factual issue on whether [plaintiff's] property was treated differently from other similarly situated properties").

warning—to someone displaying a protest or other political sign.  J.A. 1051:7-9, 1124:7-1125:20.

Nevertheless, the district court concluded this was "no evidence of *selective* enforcement."  J.A. 1213.  While it acknowledged the "[e]vidence … suggests the City has been slow to enforce the Sign Code against political speech," it found such evidence "nondispositive," chalking it up to "[a]ppropriate caution" rather than "improper discrimination."  JA. 1214.

Calling it "appropriate caution" does not solve the selective-enforcement problem.  Why did the City not extend such caution to Central Radio?  It had every opportunity and reason to do so.  In fact, to this day, the City cannot figure out how the sign code applies to Central Radio's banner.  When asked during his deposition how big Central Radio's banner could be, or how big it could be without the logo, Mr. Duke still could not say.  J.A. 683:2-4; 685:19–686:21; 694:21–695:3; 716:16-723:5.  Why?  There is not a "black-and-white answer" in the sign code, he explained.  J.A. 719:3-8.

"Appropriate caution" for political speech, J.A. 1214—especially in the face of such uncertainty—counsels in favor of *allowing* the speech.  That is what the City did, according to the district court, in refusing to cite the anti-Obama sign discussed above, J.A. 1213, and presumably the anti-abortion signs, as well.  The

53

only time Norfolk did *not* extend "appropriate caution" to political speech was

when the speech criticized the City.

Such evidence demonstrates discriminatory effect.  At a minimum, it creates

a genuine issue of material fact on the matter.

## 2.    The City's Enforcement Of The Sign Code Was Discriminatory In Purpose

The City's enforcement of the sign code was also discriminatory in

purpose.[20]  The "discriminatory purpose" element of a selective enforcement claim

is satisfied where "the selective treatment was motivated by an intention to …

punish or inhibit the exercise of constitutional rights," *FSK Drug Corp. v. Perales*,

960 F.2d 6, 10 (2nd Cir. 1992)—including the "exercise of first amendment

rights."  *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1419 (4th Cir.

1985).[21]

Such discriminatory purpose may be shown by direct or circumstantial

evidence, *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997), and in

---

[20] The requirement of showing discriminatory purpose for a selective-enforcement claim in the First Amendment context has been widely criticized.  *See, e.g.*, Karl S. Coplan, *Rethinking Selective Enforcement in the First Amendment Context*, 84 Colum. L. Rev. 144 (1984).  Central Radio hereby preserves, for potential Supreme Court review, the argument that it should not be required.

[21] The discriminatory purpose need not have been the sole reason for the decision or even the primary one.  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982); *Wayte*, 470 U.S. at 610.  It need only have been a "motivating factor."  *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

making the inquiry, courts are guided by the factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Those factors include

- "the impact of the official action" and whether "it bears more heavily on one [group] than another";

- "[t]he historical background of the decision";

- "[t]he specific sequence of events leading up to the challenged decision";

- "[d]epartures from the normal procedural sequence";

- "[s]ubstantive departures …, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and

- "[t]he legislative or administrative history."

*Id.* at 266-68. Here, these factors overwhelmingly support the conclusion that the City's enforcement against Central Radio was motivated by an impermissible purpose—namely, to "inhibit the exercise of constitutional rights." *FSK Drug Corp.*, 960 F.2d at 10.

First, "the impact of the official action" on Central Radio cannot be understated, and it clearly bore "more heavily" on Central Radio than on anyone else in Norfolk. *Arlington Heights*, 429 U.S. at 266. "Since the day the ink dried on the Bill of Rights, [t]he right of an American citizen to criticize public officials and policies … [has been] the central meaning of the First Amendment." *McCurdy*

55

*v. Montgomery Cnty.*, 240 F.3d 512, 520 (6th Cir. 2001) (first alteration and

omission in original; internal quotation marks omitted).  The City's enforcement

denied Central Radio that right at a time when Central Radio most desperately

needed it—as its property was being threatened with a taking that was ultimately

held unlawful.

The next *Arlington Heights* factors—the "historical background of the

decision" and "the specific sequence of events leading up to" it, 429 U.S. at 267—

likewise evince discriminatory purpose.  The enforcement action *only* came about

because an official with the ODU Real Estate Foundation—the very entity that

stood to acquire Central Radio's property—complained about Central Radio's

banner to Rick Henn, a development official for the City.  J.A. 160:15-161:3;

893:18-894:22.  Mr. Henn, in turn, relayed the complaint to the Planning

Department, J.A. 162:12-163:4, and, in short order, the City—whose

Redevelopment and Housing Authority was effecting the unlawful taking—cited

Central Radio.  The history and sequence suggest strongly a purpose of silencing

Central Radio.

The City's enforcement was also a "[d]eparture[] from the normal

procedural sequence," 429 U.S. at 267, which is the next *Arlington Heights* factor.

Typically, zoning inspectors investigate potential violations on their own without

consulting others.  J.A. 1064:2-1065:8.  In this case, however, the City's chief

inspector, Ms. Garrett, discussed the banner with two top zoning officials—Mr.
Duke, director of the Planning Department, and Leonard Newcomb, manager of
the Land Use Services Bureau, J.A. 670:12-18; 676:1-11—who, in turn, ordered
Ms. Garrett and Inspector Tanner to commence enforcement against Central Radio.
J.A. 707:11-25; 712:22-713:8; 1076:2-16.  This departure from the ordinary
procedural course, particularly the involvement of top City officials, suggests an
unusual sensitivity to and discomfort with Central Radio's banner.

   The next *Arlington Heights* factor, "[s]ubstantive departures," is also
relevant here, because "factors usually considered important by the [City] strongly
favor a decision contrary to the one reached."  429 U.S. at 267.  Usually, the City
took what the district court called "appropriate caution" with respect to political
signs.  J.A. 1214.  Such caution was afforded to the anti-Obama sign and anti-
abortion signs, discussed above.  In fact, it was *always* afforded:  Ms. Garrett
testified that she could not recall a single instance in twenty-five years in which the
City cited a political sign.  J.A. 1124:7-1125:20.  Only with Central Radio's banner
criticizing the City itself did the City decide to throw "appropriate caution" to the
wind.  *See United States v. Crowthers*, 456 F.2d 1074, 1079 (4th Cir. 1972)
(holding enforcement of disorderly-conduct regulation against "Mass for peace"
was unconstitutionally selective when other political and religious events had been
allowed); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144,

168 (3d Cir. 2002) ("[T]he Borough's invocation of the often-dormant Ordinance 691 against conduct motivated by Orthodox Jewish beliefs is sufficiently suggestive of discriminatory intent that we must apply strict scrutiny." (internal quotation marks and citation omitted)).

The final *Arlington Heights* factor—"legislative or administrative history," 429 U.S. at 268—also evinces discriminatory purpose.  The City Council's Redevelopment Plan, after all, repeatedly states that it requires "an intensive effort" between City officials, ODU, and the Norfolk Redevelopment and Housing Authority to "achieve completion of the project" and for the "resolution of the problems facing the Project Area."[22]  Central Radio threatened to stand in the way of that project and it was cited for doing so.

In short, the record is replete with "direct or circumstantial evidence from which a discriminatory purpose can be inferred."  *Campbell v. City of New Kensington*, No. 05-0467, 2009 WL 3166276, at *7 (W.D. Pa. Sep. 29, 2009).  At a minimum, there is a genuine issue of material fact requiring that the case be remanded and Central Radio "given the opportunity to demonstrate that the city … was motivated in part by a desire to inhibit the … exercise of their First

---

[22] NRHA, Redevelopment Plan for the Hampton Boulevard Redevelopment Project 41, 49 (Jan. 27, 1998), *available at* http://www.norfolk.gov/documentcenter/view/1656.

Amendment rights." *Tacynec v. City of Philadelphia*, 687 F.2d 793, 801 (3d Cir. 1982).

Finally, it is important to note that the selective enforcement problem in this case is exacerbated by the fact that the sign code is "complaint-driven." *See* J.A. 668:4-10; 946:3. The problem with complaint-driven enforcement schemes, as Mr. Duke testified, is "human nature." J.A. 668:17-21. Such schemes allow private biases to enter the law enforcement equation, and the Supreme Court has held that "the law cannot, directly *or indirectly*, give … effect" to "private biases." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (emphasis added); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (holding city violated Equal Protection Clause when it denied a special use permit for home for the mentally retarded in response to the "negative attitudes" and "fears" of neighbors); *Smith*, 682 F.2d at 1065 (finding impermissible discriminatory intent where "the actions of the [governmental] defendants … resulted directly from the community's deeply-felt, intentional, invidious racial animus").

Complaint-driven enforcement of *speech* regulations is particularly problematic for two reasons. First is the fundamental nature of First Amendment right impacted. Second is the fact that it practically *invites* personal bias into the enforcement equation: people will likely complain because of disagreement with, or offense taken at, a message. It stretches the believable, for example, to think the

official from the ODU Estate Foundation—which, in conjunction with the Norfolk Redevelopment and Housing Authority, was trying to use eminent domain to acquire Central Radio's property—complained about Central Radio's banner for any reason *other* than the message it bore.  When the possibility of such private bias entering the picture is so great—and the right impacted so fundamental—there is simply too much risk to tolerate.  *See Stormans, Inc. v. Selecky*, 854 F. Supp. 2d 925, 980 (W.D. Wash. 2012) (holding that "relying on citizen complaints has only made the selective enforcement problem worse" because complaints were filed based on "private bias").

## VIII.  STATEMENT REGARDING ORAL ARGUMENT

Central Radio respectfully requests oral argument and believes it would aid the Court in resolving this appeal, which raises a number of significant constitutional issues.

## IX.   CONCLUSION

The district court erred in denying Central Radio's motion for summary judgment and granting summary judgment for the City.  For the foregoing reasons, this Court should reverse the district court's order and enter a judgment in Central Radio's favor:  (1) declaring the sign-code provisions applied to Central Radio's banner—including the size restriction, permit requirement, and definition of "sign"—unconstitutional on their face and as applied; (2) enjoining the City from

enforcing those provisions; (3) declaring that the City engaged in unconstitutional selective enforcement of its sign code; (4) declaring that the City's complaint-driven enforcement scheme for regulations of speech is unconstitutional; and (5) enjoining the City from continuing to engage in selective- and complaint-based enforcement of its sign code.

Respectfully submitted October 8, 2013.

**INSTITUTE FOR JUSTICE**

<u>s/Michael E. Bindas</u>
Michael E. Bindas (WA Bar No. 31590)
10500 NE 8th Street, Suite 1760
Bellevue, WA 98004
Tel:  (425) 646-9300
Fax:  (425) 990-6500
Email:  mbindas@ij.org

Robert P. Frommer (VA Bar No. 70086)
Erica Smith (NY Reg. No. 4963377)
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel:  (703) 682-9320
Fax:  (703) 682-9321
Emails:  rfrommer@ij.org; esmith@ij.org

*Attorneys for Appellants/Cross-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 13,949 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief  has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14pt Times New Roman.


Dated: <u>October 9, 2013</u>          <u>/s/ Michael Bindas</u>
                                            *Counsel for Appellants/Cross-Appellees*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 9th day of October, 2013, I caused this Corrected

Brief of Appellants/Cross-Appellees and Joint Appendix to be filed electronically

with the Clerk of the Court using the CM/ECF System, which will send notice of

such filing to the following registered CM/ECF users:

Adam Daniel Melita
Melvin Wayne Ringer
City Attorney's Office
810 Union Street
Norfolk, VA 23510
(757) 664-4366
(757) 664-4529

*Counsel for Appellee/Cross-Appellant*

I further certify that on this 9th day of October, 2013, I caused the required

paper copies of the Corrected Brief of Appellants/Cross-Appellees and Joint

Appendix to be hand filed with the Clerk of the Court.

/s/ Michael Bindas
*Counsel for Appellants/Cross-Appellees*