RECORD NOS. 13-1996(L), 13-1997 XAP

In The

# United States Court of Appeals
### For The Fourth Circuit

## CENTRAL RADIO COMPANY INC.;
## ROBERT WILSON; KELLY DICKINSON,

*Plaintiffs – Appellants/Cross-Appellees*,

**v.**

## CITY OF NORFOLK, VIRGINIA,

*Defendant – Appellee/Cross-Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### AT NORFOLK

———————

### BRIEF OF APPELLEE/CROSS-APPELLANT

———————

**Adam D. Melita**
**Melvin W. Ringer**
**CITY ATTORNEY'S OFFICE**
**810 Union Street**
**Norfolk, Virginia 23510**
**(757) 664-4366**

*Counsel for Appellee/Cross – Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  13-1996L      Caption:  Central Radio Company, Inc., et al. v. City of Norfolk

Pursuant to FRAP 26.1 and Local Rule 26.1,

City of Norfolk
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
        (appellant/appellee/amicus)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                     ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                            ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Adam Daniel Melita                    Date:   August 19, 2013

Counsel for: City of Norfolk

# CERTIFICATE OF SERVICE
****************************

I certify that on ___August 19, 2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Steven MacDonald Simpson
Institute for Justice
901 North Glebe Road, Suite 900
Arlington, VA  22203
Email:  ssimpson@ij.org

s/ Adam Daniel Melita                              August 19, 2013
_____(signature)_____                   _____(date)_____

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ..........................................................................iv

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF CASE ................................................................................2

STATEMENT OF FACTS .............................................................................5

     I.      CENTRAL RADIO ERECTS A 375 SQUARE FOOT SIGN .............5

     II.     CENTRAL RADIO COMPLAINS ABOUT OTHER SIGNS AROUND THE CITY.........................................................................9

     III.    CENTRAL RADIO NEGLECTS TO FILE A NOTICE OF APPEAL................................................................................10

SUMMARY OF ARGUMENT .....................................................................11

STANDARD OF REVIEW ...........................................................................12

ARGUMENT ................................................................................................13

     I.      THE NEGLECT THAT CAUSED CENTRAL RADIO TO MISS THE FILING DEADLINE WAS NOT "EXCUSABLE" ........13

           A.     The neglect committed by Central Radio is the same sort of inattentiveness documented in *Symbionics Inc. v. Ortlieb* .................................................................................15

i

B.    The district court's failure to follow established precedent constitutes an abuse of discretion..............................17

II.    THE APPLICABLE SIGN REGULATIONS DO NOT VIOLATE THE FIRST AMENDMENT............................................21

A.    The sign ordinance regulations are content-neutral.................22

    (1)    The operative Sign Code regulations are based solely on size and location and have nothing to do with the message............................................................23

    (2)    There is no evidence that the sign regulation was adopted because of a disagreement with any particular message. .......................................................24

    (3)    The City's statement of its interests in regulating the size and location of wall signs in industrial districts is unrelated to any content such signs might contain ..................................................................25

B.    The Sign Code regulations are narrowly tailored to serve a substantial governmental interest...........................................27

    (1)    The City demonstrated that the Sign Code serves a legitimate governmental interest ....................................28

    (2)    The Sign Code is not impermissibly underinclusive......33

C.    Ample means of communication other than displaying a 375 square foot sign are available to Central Radio ................35

D.    The existence of a limited number of exemptions from some of the Sign Code's requirements does not render the ordinance content-based......................................................37

    (1)    The United States Supreme Court has never adopted such a strict standard for signs ..........................38

(2)    The First Amendment does not require the City to regulate all forms of visual speech identically ...............41

III.    THE SIGN CODE DOES NOT ALLOW FOR DISCRETION IN THE APPROVAL OR DENIAL OF SIGN PERMIT APPLICATIONS..................................................................................48

    A.    Because the Sign Code is content-neutral, no time limit is required ........................................................................49

    B.    The Sign Code does not accommodate or allow for unbridled discretion in the granting of sign permits.................50

IV.    THE CITY'S COMPLAINT-BASED ENFORCEMENT PROCESS IS NOT UNCONSTITUTIONAL ....................................53

    A.    The complaint-based approach does not violate Central Radio's right to equal protection under the Fourteenth Amendment..............................................................................53

    B.    The complaint-based approach does not violate Central Radio's right to free speech under the First Amendment.........61

CONCLUSION.................................................................................................63

REQUEST FOR ORAL ARGUMENT .................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Legion Post 7 v. City of Durham*,
  239 F.3d 601 (4th Cir. 2001) ..........................................................................35

*Arlington County Republican Comm. v. Arlington County, Va.*,
  983 F.2d 587 (4th Cir. 1993) ......................................................22, 25, 27, 36

*Bd. of Zoning Appeals ex rel. County of York v. 852 L.L.C.*,
  257 Va. 485, 514 S.E.2d 767 (1999) ..............................................................52

*Brown v. Town of Cary*,
  706 F.3d 294 (4th Cir. 2013) ......................................................29, 34, 41, 42

*Burson v. Freeman*,
  504 U.S. 191 (1992)..........................................................................................34

*City of Ladue v. Gilleo*,
  512 U.S. 43, 114 S. Ct. 2038 (1994) ......................................................*passim*

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992)..........................................................................................51

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 530, 100 S. Ct. 2326 (1980) ............................................................24

*Covenant Media of S.C., Ltd. Liab. Corp. v. City of N. Charleston*,
  493 F.3d 421 (4th Cir. 2007) ......................................................22, 27, 28, 49

*Cuccinelli v. Rector, Visitors of Univ. of Va.*,
  283 Va. 420, 722 S.E.2d 626 (2012) ..............................................................46

*Dalenko v. News & Observer Pub. Co.*,
  447 F. App'x 490 (4th Cir. 2011)......................................................................4

*Davenport v. City of Alexandria, Va.*,
   710 F.2d 148 (4th Cir. 1983) ..........................................................31

*Doctor v. Seaboard Coast Line R. Co.*,
   540 F.2d 699 (4th Cir. 1976) ..........................................................21

*Edenfield v. Fane*,
   507 U.S. 761, 113 S. Ct. 1792 (1993) ......................................31, 32

*Freedman v. State of Md.*,
   380 U.S. 51, 85 S. Ct. 734 (1965) ............................................48, 49

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
   218 F.3d 337 (4th Cir.2000) ..........................................................13

*James v. Jacobson*,
   6 F.3d 233 (4th Cir. 1993) ........................................................13, 21

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
   466 U.S. 789, 104 S. Ct. 2118 (1984) ............................................42

*Metromedia, Inc. v. City of San Diego*,
   453 U.S. 490, 101 S. Ct. 2882 (1981) ...........................39, 40, 41, 47

*Nat'l Adver. Co. v. City of Orange*,
   861 F.2d 246 (9th Cir. 1988) ...................................................37, 38

*Nat'l Fed'n of the Blind v. F.T.C.*,
   420 F.3d 331 (4th Cir. 2005) ..........................................................34

*N.C. Right to Life, Inc. v. Bartlett*,
   168 F.3d 705 (4th Cir. 1999) .........................................................52

*Neighborhood Enters., Inc. v. City of St. Louis*,
   644 F.3d 728 (8th Cir. 2011) ...........................................37, 41, 45

*Oyler v. Boles*,
   368 U.S. 448, 82 S. Ct. 501 (1962) ..........................................53, 54

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Ptn'shp*,
  507 U.S. 380, 113 S. Ct. 1489 (1993) .........................................14, 17, 19, 20

*PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth.*,
  286 Va. 174, 747 S.E.2d 826 (2013) ......................................................5, 57

*Posadas de Puerto Rico Assocs. v. Tourism Co. of P.R.*,
  478 U.S. 328, 106 S. Ct. 2968 (1986) ..........................................................42

*Robinson v. Wix Filtration Corp. LLC*,
  599 F.3d 403 (4th Cir. 2010) .......................................................................16

*Rossignol v. Voorhaar*,
  316 F.3d 516 (4th Cir. 2003) .......................................................................13

*Solantic, LLC v. City of Neptune Beach*,
  410 F.3d 1250 (11th Cir. 2005) .............................................................37, 38

*Stone v. Instrumentation Lab. Co.*,
  591 F.3d 239 (4th Cir. 2009) .................................................................50, 51

*Sylvia Dev. Corp. v. Calvert County, Md.*,
  48 F.3d 810 (4th Cir. 1995) ...................................................................53, 54

*Symbionics Inc. v. Ortlieb*,
  432 F. App'x 216 (4th Cir. 2011).........................................................*passim*

*Thomas v. Chicago Park Dist.*,
  534 U.S. 316, 122 S. Ct. 775 (2002) .....................................................49, 61

*Thompson v. E.I. DuPont de Nemours & Co.*,
  76 F.3d 530 (4th Cir. 1996) .......................................................14, 18, 19, 20

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622, 114 S. Ct. 2445 (1994) ..........................................................27

*U.S. Dep't of Labor v. N.C. Growers Ass'n*,
  377 F.3d 345 (4th Cir. 2004) .......................................................................50

*United States v. Torres*,
  372 F.3d 1159 (10th Cir. 2004) ....................................................................4

*Veney v. Wyche*,
  293 F.3d 726 (4th Cir. 2002) .....................................................................53

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)....................................................................................57

*Wag More Dogs, Ltd. Liab. Corp. v. Cozart*,
  680 F.3d 359 (4th Cir. 2012) ..............................................................*passim*

*Ward v. Rock Against Racism*,
  491 U.S. 781, 109 S. Ct. 2746 (1989) ...................................................27, 45

*Wayte v. United States*,
  470 U.S. 598, 105 S. Ct. 1524 (1985) ...................................................53, 56

*Wightman v. Springfield Terminal Ry. Co.*,
  100 F.3d 228 (1st Cir. 1996)......................................................................13

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. I ........................................................................*passim*

U.S. CONST. amend. XIV .......................................................1, 53, 60

## ATTORNEY GENERAL OPINION

1984-85 Va. Op. Att'y Gen. 91, 1985 WL 192263 (1985) ....................................46

## STATUTES

Va. Code Ann. § 15.2-2307 (1950) ....................................................46

Va. Code Ann. § 23-49.13 (1950).......................................................46

Va. Code Ann. § 36-4 (1950)..............................................................5

Va. Code Ann. § 36-27 (1950).............................................................5

Va. Code Ann. § 36-49 (1950)..........................................................................5

Va. Code Ann. § 36-49.13 (1950)..................................................................46

28 U.S.C. § 1291...........................................................................................1

28 U.S.C. § 1331...........................................................................................1

28 U.S.C. § 1343(a)(4)..................................................................................1

## **<u>RULES</u>**

Fed. R. App. P. 4(a)(1)...........................................................................10, 11

Fed. R. App. P. 4(a)(5)...........................................................................12, 18

Fed. R. App. P. 4(a)(5)(A) ...................................................................1, 4, 5

Fed. R. Civ. P. 11(b) ..................................................................................16

Fed. R. Civ. P. 30(b)(6)..............................................................................44

Fed. R. Civ. P. 32(d)(3)..............................................................................44

Fed. R. Civ. P. 56(c)..............................................................................44, 61

## **<u>OTHER AUTHORITIES</u>**

*Zoning Ordinance of the City of Norfolk, 1992* ................................................*passim*

## JURISDICTIONAL STATEMENT

The complaint in the instant dispute alleges violations of certain clauses of the First and Fourteenth Amendments to the Constitution of the United States. For these reasons, subject matter jurisdiction in the federal district court attached pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

Jurisdiction of the subject matter contained in the complaint has *not* attached in this Circuit Court, however, since no timely notice of appeal was filed after judgment was rendered on May 15, 2013, and the district court's grant of an extension to the time allowed for filing was an abuse of its discretion.

However, the district court's order of July 30, 2013 granting an extension to the time allowed for filing a notice of appeal was a final order (J.A. 1330), and jurisdiction over the subject matter decided by that order exists in this Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court abused its discretion when it granted Plaintiffs' motion for an extension to file a notice of appeal based on "excusable neglect," under Fed. R. App. P. 4(a)(5)(A).

2.  Whether the district court erred when it found that the City of Norfolk's sign regulations were content-neutral and do not violate the Plaintiffs' rights guaranteed by the First Amendment.

1

3.      Whether the district court erred when it found that the City of Norfolk's sign regulations that require a permit before erecting a sign amount to an unlawful prior restraint, in violation of the First Amendment.

4.      Whether the district court erred when it found that the facts were insufficient to establish any claim that the complaint-based enforcement process employed by the City of Norfolk to address violations of the sign code violated Plaintiffs' rights to equal protection.

## STATEMENT OF CASE

On April 5, 2012, the City of Norfolk (hereinafter "City") issued a notice of zoning violation to Central Radio Co., Inc. in relation to a sign erected at its property located at 1083 West 39th Street.  (J.A. 55, 57).  On May 2, 2012, the Plaintiffs (hereinafter "Central Radio") filed a complaint and motion for emergency and preliminary injunctive relief seeking to prevent the City from enforcing any of its sign regulations against them.  (J.A. 3).

The complaint (which was later amended) asserted that the City's sign regulations, found in Chapter 16 of the *Zoning Ordinance of the City of Norfolk, 1992* (hereinafter "Sign Code"), and actions taken to enforce those regulations violated Central Radio's constitutional rights.  The lawsuit listed four counts.

2

Count One alleged that the City's sign regulations violate the First Amendment's freedom of speech clause by limiting the size of a sign Central Radio desired to display at its property. (J.A. 28-29). It also alleged that the City's sign regulations were unconstitutionally underinclusive, since signs similar in size to the one Central Radio desired were found on display at other locations around the City. (J.A. 29 at ¶ 118).

Count Two claimed that the City's sign rules are content-based such that they unlawfully restrain certain messages, which also constitutes a violation of the First Amendment. (J.A. 30-31).

Count Three purported to present a selective enforcement claim, alleging that the City had targeted Central Radio's sign for enforcement even though it was not pursuing enforcement against other signs around the City that were of similar size to Central Radio's. (J.A. 21-22).

The fourth and final count claimed that a regulation which required a permit for the installation of a sign violated the First Amendment because it created an unlawful prior restrain on speech. (J.A. 22-23).

Upon consideration of the request for an emergency injunction, the trial court noted that Central Radio had a right to trigger a statutory stay against all enforcement activity by noting an appeal of the violation notices. (Ord. 2, May 4, 2012, Wright Allen, J.). For this reason, the district court denied the request for an

emergency injunction.  *Id.*  A hearing on the motion for a preliminary injunction was subsequently scheduled.

On June 28, 2012, the parties presented evidence and argument on the preliminary injunction motion.  (J.A. 284-386).  By order dated July 27, 2012, the trial court denied Central Radio's request for a preliminary injunction.  After considerable discovery, the parties filed cross motions for summary judgment.  (J.A. 35-36, 205).

On May 15, 2013, the district court entered a final order denying Central Radio's summary judgment motion and granting the City's cross motion.  (J.A. 1200-1216).  During the 30-day appeal period following entry of the final order nothing was filed.  (J.A. 8).

On June 19, 2013—five days after the deadline to appeal had passed—Central Radio moved for an extension to file an notice of appeal, asserting that the failure to file before the deadline was due to "excusable neglect".[1]  (J.A. 1218-

---

[1]     Because Central Radio's request was made after the expiration of the 30-day appeal window, the only avenue for relief under the Rule cited in its motion—Fed. R. App. P. 4(a)(5)(A)—required a showing that the tardiness was due to either "excusable neglect" or "good cause."  "Good cause" for an extension under Rule 4(a)(5)(A) is implicated when "fault is not an issue, and the need for an extension is caused by something beyond the appellant's control."  *Dalenko v. News & Observer Pub. Co.*, 447 F. App'x 490, 491 (4th Cir. 2011) (citing *United States v. Torres*, 372 F.3d 1159, 1161 n.1 (10th Cir. 2004)).  Although Central Radio argued to the trial court that its failure to file on time was "due to either a clerical error by one of counsel's employees or a defect in the Court's computer system" (J.A. 1329), it submitted no evidence to support the latter theory.  Because the movant

4

1219).    On July 30, 2013, the district court granted the motion (J.A. 1330), whereafter Central Radio noted its appeal of the May 15th order dismissing its complaint (J.A. 1331).    On August 5, 2013, the City noted its appeal of the July 30th order that granted the filing extension.  (J.A. 1334).

## STATEMENT OF FACTS

## I.    CENTRAL RADIO ERECTS A 375 SQUARE FOOT SIGN.

Sometime around 2009, the Norfolk Redevelopment and Housing Authority (hereinafter "NRHA") had expressed its intention to take Central Radio's property through eminent domain.  (J.A. 290).  The NRHA is a political subdivision created by the Commonwealth of Virginia.  Va. Code Ann. § 36-4 (1950).[2]  It is vested with the power of eminent domain by the Commonwealth.[3]  Va. Code Ann. §§ 36-27, 36-49 (1950); *see also*, *PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth.*, 286 Va. 174, 178, 747 S.E.2d 826, 828 (Va. 2013).

---

produced no facts to show that the failure was due to something beyond its control, "excusable neglect" was the sole basis upon which the trial court could consider granting relief under Rule 4(a)(5)(A).

[2]    Central Radio erroneously states that the "Norfolk City Council" created the NRHA.  (Br. of Appellants 4).

[3]    Central Radio erroneously states that the "Norfolk City Council" granted NRHA the authority to use eminent domain when it adopted the Hampton Boulevard Redevelopment Project.  (Br. of Appellants 4).  It is important that this error be corrected, since it could mislead the reader into believing that the City of Norfolk had some involvement with NRHA's condemnation efforts.  In point of fact, the City did *not* support NRHA's use of eminent domain for the Hampton Boulevard Redevelopment Project.  (J.A. 590).

Around March of 2012, Central Radio erected a sign at their property located at 39th Street in the City of Norfolk (hereinafter "Property"). (J.A. 293-294). The sign is approximately 375 square feet in size and is affixed to an exterior side wall of a building situated on the Property. (J.A. 226, 293). The sign contains text with information about the business operating on the Property, an image of the United States flag, the phrase "Threatened by Eminent Domain!" and a graphic showing a red circle with a line through it around the words "Eminent Domain Abuse." (J.A. 222).

Central Radio erected the sign out of frustration with the NRHA's effort to condemn its Property. (J.A. 292-293, 299-300). It "wanted to put up something that would keep this problem in the public view" and "to shout a protest." (J.A. 299-300). It also wanted to "clarify that we did not want Central Radio's property to be taken, no matter the price." (J.A. 38-39 at ¶ 4).

The Property is included in an area designated by the City as a light industrial zoning district known as the "I-1" district. (J.A. 350). The Property fronts on the south side of 39th Street, extending 100 feet along the street. (J.A. 226, 322). It is improved with a single, rectangular building approximately 90 feet wide, and one side of the building looks toward Hampton Boulevard, a street located about 150 feet from the edge of the Property. (J.A. 226, 322-333). The

building is set back from the side property line approximately four feet. (J.A. 320-321).

The I-1 district designation imposes a variety of land use restrictions on the Property, including regulations addressing the display of signs. (J.A. 275-276). The rules governing what signs can lawfully be erected on the Property are found in the Sign Code. (J.A. 255). Given the dimensions of the Central Radio building, the maximum amount of wall signage allowed would be around 90 square feet. (J.A. 428-429). In addition to the wall signage, the Sign Code also permits Central Radio to display a freestanding sign with up to 64 square feet of message area[4] (J.A. 276 at § 16-8.3(b), 742-743, 952-955) and a temporary sign with another 60 square feet of message space (J.A. 425, 680-681).

Because of limited resources, the City has adopted a "complaint-driven" approach to enforcement of the sign ordinance. (J.A. 392, 399-400, 427). In practice this means that the five employees who regularly investigate alleged sign violations (J.A. 422) do not maintain roving patrols throughout the City. (J.A.

---

[4] Central Radio erroneously states that Central Radio could not place a freestanding sign on the Hampton Boulevard side of their property. (Br. of Appellants 9). The facts clearly show that they *can* install such a sign, although "[i]t would need to be toward the front" and "[t]hey would lose parking spaces." (J.A. 743). The aerial photograph shows the parking lot at the front of the Property where the sign could be placed. (J.A. 226). An employee of the company admitted that the freestanding sign could safely be placed there, commenting that "we're limited on parking there so we can't afford to lose any more." (J.A. 325). So while Central Radio may be unwilling the install a freestanding sign in the parking lot, the Sign Code presents no obstacle to doing so.

392). Instead, they investigate the issue and the property which is the subject of the complaint and, in the process of doing so, also inspect the vicinity around the location of the alleged violation, assessing whether similar issues exist on neighboring properties. (J.A. 392-393, 427).

After the sign was put up, a City employee, Rick Henn, received information from a citizen stating that there was a large sign on Central Radio's building. (J.A. 459-460). No information about the nature of the message on the sign was provided. (J.A. 461). Mr. Henn told the citizen that he would have staff from the City's Department of Planning investigate. (J.A. 460). After hearing this, the citizen said "Don't worry about it."[5] *Id.* Nevertheless, he referred the inquiry about the sign to a zoning enforcement inspector whom he knew to be effective and prompt in her work. (J.A. 449, 462-463). At no time did he disclose the complainant's identity to any zoning enforcement personnel. (J.A. 452, 462-463).[6]

On Friday, March 30, 2012, Harold Tanner, an inspector whose job focuses on any building issues that a given sign may present (J.A. 796, 1155), visited the Property in response to the complaint and observed the sign. (J.A. 326, 436-438). He then spoke to someone at the Property and verbally informed him that the sign

---

[5] Central Radio erroneously states that the City investigated the sign "at the behest of the Old Dominion Real Estate Foundation." (Br. of Appellants 7). The evidence clearly shows that the sign was investigated despite the complaining citizen's request to ignore it. (J.A. 460).

[6] Mr. Henn did not disclose the identity of the citizen complainant to *anyone* until after this suit was commenced. (J.A. 462-465).

8

was too big.  (J.A. 438).  He also asked if Central Radio could either remove the sign or come to the office to get a permit.  *Id.*

Six days later, both Mr. Tanner and Leslie Garrett, the City's Zoning Enforcement Coordinator, visited the property.  (J.A. 439-440).  Unlike Mr. Tanner, Ms. Garrett's focus is directed towards assessing any zoning compliance issues that a sign might present, as opposed to building code issues.  (J.A. 797, 1054-1055).  Finding the sign was still on display, each of them issued a notice of violation to Central Radio.  (J.A. 228-229, 327-328, 439-440).  At no time—from the initial receipt of the complaint, through the investigation, and ending with the issuance of citations—did the enforcement personnel involved with this case have any knowledge about who was the source of the initial complaint.  (J.A. 430-431, 437, 451-452, 462-465).

## II.  CENTRAL RADIO COMPLAINS ABOUT OTHER SIGNS AROUND THE CITY.

In its complaint filed with the district court, Central Radio listed several other signs that are regulated under the City's sign ordinance which it alleges are similar in size to its own.  (J.A. 25-26).  The City was first presented with this list on August 28, 2012, as an attachment to Central Radio's Motion to Amend Complaint.  (J.A. 6).  Nothing in the record indicates that the City received a complaint about any of these signs at any time before Central Radio identified them on late August, 2012.  Nevertheless, because the legality of these signs was

9

questioned, the signs were investigated and enforcement action was taken against those which did not comply with the sign ordinance. (J.A. 401-405, 408-417, 423-424, 453). Zoning violation notices were issued for the illegal ones approximately two weeks after the City first received the complaint. (J.A. 467-469).

## III. CENTRAL RADIO NEGLECTS TO FILE A NOTICE OF APPEAL.

On May 15, 2013, the district court dismissed Central Radio's lawsuit. (J.A. 1216). The deadline to note any appeal from that ruling was June 14th. Fed. R. App. P. 4(a)(1).

On June 11th, three days before the deadline expired, Robert Frommer—one of the three attorneys who represented Central Radio before the district court—instructed a paralegal that works in his firm, Dominique Perez, to file a notice of appeal. (J.A. 1310 at ¶ 3). Perez started this task at around 10:00 a.m. that day and stopped around 10:09 a.m. (J.A. 1222 at ¶ 5, 1224 at ¶¶ 17-19). During this time, she submitted an online credit card payment and received an e-mail stating, "Your payment has been submitted to Pay.gov and the details are below." (J.A. 1224 at ¶ 17, 1256).

Perez states that, at this point, she thought that she had successfully filed the appeal notice. (J.A. 1224 at ¶ 19). She then stopped the filing process, incorrectly believing that it had been completed. (J.A. 1327). As a result, no notice of appeal was filed. (J.A. 1224 at ¶ 20). Nevertheless, she advised Mr. Frommer that it had

10

been. (J.A. 1304 at ¶ 5). Mr. Frommer did not confirm this information. (J.A. 1327). Instead, he chose to wait for the Fourth Circuit Court of Appeals to send him a notice that the appeal had been docketed. (J.A. 1311 at ¶ 7, 1327).

The deadline to file the appeal notice expired nearly four days later, at 11:59 p.m. on June 14th. Fed. R. App. P. 4(a)(1). Perez did not check on the attempted filing until June 18th. (J.A. 1224 at ¶ 20). Based on all of the statements and documents submitted to the trial court, it appears that none of Central Radio's three attorneys of record checked on the attempted filing at any time before the appeal period expired. Mr. Frommer, who had asked Perez to file the notice, never received an e-mail from the CM/ECF system to confirm the filing. (J.A. 1311 at ¶ 7). The only information that Central Radio's attorneys had to suggest that the notice of appeal had been filed was Perez's statement. (J.A. 1310 at ¶ 4, 1311 at ¶ 8, 1315). The district court never provided anything to any of the three attorneys—via e-mail, through the CM/ECF system, by phone, or otherwise—which might suggest that the notice of appeal had been filed.

## SUMMARY OF ARGUMENT

The district court's finding that Central Radio's failure to timely file a notice of appeal was due to "excusable neglect" should be reversed because the court's assessment of the relevant factors was contrary to established precedent. It incorrectly viewed a lack of bad faith on the part of the tardy party as evidence that

11

the neglect was excusable.  But all of the precedents applicable in the Fourth Circuit indicate that a lack of bad faith is *never* relevant to a determination of excusable neglect.  Because Central Radio's failure to file before the deadline does not present an extraordinary case "where injustice would otherwise result," *Symbionics Inc. v. Ortlieb*, 432 F. App'x 216, 220 (4th Cir. 2011), the district court's grant of an extension should be reversed and this appeal (Record No. 13-1996) should be dismissed for lack of jurisdiction.

If Central Radio's appeal is not dismissed, then the district court's ruling that that City's Sign Code passes constitutional muster should be affirmed.  The evidence clearly shows that the Sign Code's regulations are content neutral under all the tests employed by the Fourth Circuit.  Because it is content neutral, the trial court was also correct to find that the Sign Code does not create an unlawful prior restrain on speech.  Lastly, the court was correct to observe that the evidence fails to show any inkling of an equal protection violation.  Therefore its ruling that Central Radio's rights under the Fourteenth Amendment were not violated should also be affirmed.

## STANDARD OF REVIEW

Two different standards of review apply in this appeal and cross-appeal. The standard of review of the trial court's decision to grant an extension to file a notice of appeal under Fed. R. App. P. 4(a)(5) requires showing an "abuse of

discretion." *Symbionics Inc. v. Ortlieb*, 432 F. App'x 216, 218 (4th Cir. 2011). An abuse of discretion occurs whenever the district court "fails 'to take into account judicially recognized factors constraining its exercise,' or when its action is tainted 'by erroneous factual or legal premises.'" *Id.* at 218 (citing *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993)).

The standard for reviewing the trial court's rulings on the parties' cross-motions for summary judgment is *de novo*. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 340-41 (4th Cir. 2000). For cross-motions, this Court must review each motion separately on its own merits. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

## **ARGUMENT**

## I.    **THE NEGLECT THAT CAUSED CENTRAL RADIO TO MISS THE FILING DEADLINE WAS NOT "EXCUSABLE".**

The district court found that Central Radio's failure to file before the deadline was a mistake, not a bad faith stratagem, and did not cause any harm to the City. (J.A. 1329-1330). While these findings are not unreasonable given the

13

facts, the district court's conclusion that they justify granting an extension for "excusable neglect" runs squarely counter to recent, established precedent.

"Excusable neglect" is an equitable inquiry that takes account of "all relevant circumstances surrounding the party's omission." *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 533 (4th Cir. 1996). District courts in the Fourth Circuit should not find excusable neglect except in "*extraordinary cases where injustice would otherwise result.*" *Symbionics Inc. v. Ortlieb*, 432 F. App'x 216, 220 (4th Cir. 2011) (emphasis in original).

When analyzing an excusable neglect claim, a court must review the four factors set forth in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Ptn'shp*, 507 U.S. 380 (1993). In summary, those factors are: (1) the danger of prejudice to the opposing party, (2) the length of the delay, (3) the reasons for the delay, and (4) whether the negligent party acted in good faith. *Symbionics Inc.*, 432 F. App'x at 219. Of those four factors, the most important one is the untimely party's reason for being late. *Id.* If the reason is due to an error in the negligent party's administrative processes, then the request for an extension should be denied, since an "'administrative failure generally has been held to fall short of the necessary showing' for excusable neglect." *Id.* (citing *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996)). The foregoing principles operate to limit the circumstances when a district court can find "excusable neglect." *Id.* at 220.

14

A.   The neglect committed by Central Radio is the same sort of inattentiveness documented in *Symbionics Inc. v. Ortlieb.*

The *Symbionics* case, decided in 2011, involved circumstances that are remarkably comparable to the ones that are relevant in the instant case.   In *Symbionics*, the lawyer attempted to file the notice of appeal on the date shown on his calendar as the last day before the deadline expired.  *Symbionics Inc. v. Ortlieb*, 432 F. App'x 216, 218 (4th Cir. 2011).  Central Radio attempted to file the appeal three days before the deadline expired.  (J.A. 1310-1311).  In *Symbionics*, the mistake resulted from "a quirk in the functionality of counsel's computer calendar that caused counsel to miscalculate the deadline as January 5, 2010, rather that the correct date of January 4, 2010."  *Symbionics Inc.*, 432 F. App'x at 218.  For Central Radio, the mistake occurred when the paralegal stopped the electronic filing process after submitting an online credit card payment, mistakenly believing that she had submitted the appeal notice.  (J.A. 1224 at ¶ 18).  It is worth noting that both the attorney for Symbionics and the attorney for Central Radio *fully intended* to perfect the filing before the deadline expired, as evidenced by the arrangements each of them made to ensure compliance with the rule—Symbionic's attorney by placing a reminder on his calendar and Central Radio's attorney by assigning the work to a paralegal.  In each case, however, a mistake frustrated these good intentions.

15

The mistake made in each case is also similar: both resulted from a computer user's failure to catch and correct unexpected behavior in the computer's software. Yet there is one additional feature in the instant case that makes Central Radio's mistake rather *less* excusable than the one committed in *Symbionics*. After the paralegal reported back to Mr. Frommer that she had filed the notice, "[c]ounsel did not confirm this report." (J.A. 1327). Nor did he receive a confirmation e-mail from the court's CM/ECF system. (J.A. 1311 at ¶ 7). In fact, counsel did not check on the filing *at any time* during the several days between the paralegal's aborted effort to file and the expiration of the deadline. (J.A. 1329).

The only reason offered for taking this "wait-and-see" approach was counsel's mistaken belief that the next confirmation he would receive via e-mail would be "in the form of the docketing notice issued by the Fourth Circuit." (J.A. 1311 at ¶ 7).[7] In the end, the failure to check on the filing was part of the reason why Central Radio missed the filing deadline. (J.A. 1329). If the simple,

---

[7] While we do not question the sincerity of counsel's mistaken belief, we are unable to ascertain why his belief should be considered "reasonable under the circumstance." *See* Fed. R. Civ. P. 11(b) (requiring that a "belief" recited in a motion signed by an attorney must be certified as "formed after an inquiry reasonable under the circumstances"). After all, it is common knowledge that the CM/ECF system automatically generates a NEF e-mail every time a document is filed. *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 406 n.1 (4th Cir. 2010). One "reasonable inquiry" of the type expected by Rule 11(b) would have involved contacting the court to figure out why no NEF e-mail was generated after Perez completed her work on June 11th. And yet no such inquiry was made, leaving the record devoid of any explanation of how counsel came to harbor this misunderstanding about the workings of the CM/ECF confirmation system.

calendaring error made in *Symbionics* qualifies as "run-of-the-mill inattentiveness by counsel," *Symbionics Inc.*, 432 F. App'x at 220, then it follows that Central Radio's choice to stand pat for more than three days after attempting to file an appeal can fairly be described the same way.

> B.    The district court's failure to follow established precedent constitutes an abuse of discretion.

In *Symbionics*, the District Court for the Eastern District of Virginia granted a motion to extend the filing period based on its conclusion that the calendaring error was excusable neglect. *Symbionics Inc.*, 432 F. App'x at 220. This Court reversed and dismissed the appeal, finding that the trial court had abused its discretion. *Id.* In doing so, this Court did not question the district court's conclusions regarding three of the factors spelled out in the *Pioneer* test. In fact, it agreed that Symbionics' mistake did not cause any prejudice to the opposing party. *Id.* at 219. It also agreed that there was no material delay. *Id.* After all, the calendaring error only caused the filing to be one day late. *Id.* at 218. And this Court decided that consideration of the fourth *Pioneer* factor—"good faith"—was not material, suggesting that it can only effect the excusable neglect analysis when good faith is *absent.* *Id.* It is apparent from this Court's ruling in *Symbionics* and the explanation given for it that a district court commits reversible error when it gives an extension to an untimely party who misses an appeal deadline because of

inattentiveness by counsel *even if* the mistake was made in good faith. *Id.* at 219-220.

As in *Symbionics*, inattentiveness by counsel is what caused Central Radio to miss the filing deadline. After assessing all the evidence, the district court correctly determined that "The delay was caused by a mistake by counsel's paralegal, *and counsel failed to timely check whether the notice of appeal was filed properly*." (J.A. 1329) (emphasis added). It also found that "counsel failed to seek confirmation until after the deadline for appeal had expired." *Id.* Applying this Court's standards—clearly expressed in *Symbionics*—this type of neglect is not "excusable."

We can find no precedent in the Fourth Circuit to support the proposition that counsel's decision to rely on a staff member's claim that the filing was completed instead of the NEF proof of filing e-mailed by the court, combined with counsel's subsequent failure to exercise due diligence and oversight with respect to the filing deadline, can constitute excusable neglect. To the contrary, all applicable precedents indicate that the neglect demonstrated by an attorney who fails to act with due diligence to monitor the timeliness of filing an appeal is never excusable under Fed. R. App. P. 4(a)(5). *See Symbionics Inc. v. Ortlieb*, 432 F. App'x 216, 220 (4th Cir. 2011); *Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996) (attorney who mailed notice of appeal three days before the

18

deadline, trusting that the postal service would deliver in time, could not establish excusable neglect when delivery occurred three days too late).

The district court resolved the most important *Pioneer* factor against Central Radio (J.A. 1329), which shows that the finding of excusable neglect was *not* based on its analysis of the reason for the delay. The court also found that the mistake was done in "good faith" and was not a "bad faith stratagem." *Id.* It then used these findings to somehow countervail or cure Central Radio's failure of the primary *Pioneer* test. (J.A. 1330).

This approach to analyzing "excusable neglect"—awarding credits to the movant when evidence of harm or bad faith is absent—is clearly contrary to how this Court applied the *Pioneer* factors in the *Symbionics* case. When the attorney in *Symbionics* missed the deadline by one day, there was no bad faith or harm to the opposing party. *Symbionics Inc.*, 432 F. App'x at 219. Yet these facts were *not* assessed as counterweights to the most important *Pioneer* factor: the untimely party's reason for the delay. After all, it is the *absence* of good faith that is material to the "excusable neglect" inquiry, *id.*, not the presence.

As is evident by the approach taken in *Symbionics*, the jurisprudence of this Court directs that the trial court should judge the facts based on those *Pioneer* factors that are material, not an immaterial factor such as the presence of good faith. This same approach was used in the *Thompson* case, where there was no

showing that the attorney's neglect ran afoul of any of the three less-important *Pioneer* factors.  Her decision to mail the notice of appeal three days before the deadline was not done in bad faith, did not cause harm to the opposing party, nor did it cause any material delay in the judicial proceedings.  *See Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 532 (4th Cir. 1996).  So while these three *Pioneer* factors did not weigh against the movant, they certainly were not adjudged to have *enhanced* the excusability of counsel's neglect.

Careful review of the district court's opinion reveals that the court failed to take into account exactly the sort of well-established principles that "confine the circumstances under which a district court may properly find excusable neglect." *Symbionics Inc.*, 432 F. App'x at 220.  The grant of the extension was tainted by its reliance on the erroneous legal premise that the presence of "good faith" is relevant to the "excusable neglect" inquiry.  But it is the *absence* that is relevant.  *Id.* at 219. Considering "all relevant circumstances surrounding the party's omission,"[8] nothing in the facts cited by the district court indicates that the neglect demonstrated by Central Radio's failure to confirm whether its attempted

---

[8]    *See Thompson v. E.I. DuPont de Nemours & Co.*, 76 F.3d 530, 533 (4th Cir. 1996).

electronic filing succeeded presents an extraordinary case "where injustice would otherwise result."[9] *See Symbionics Inc.*, 432 F. App'x at 220.

In the instant case, the rule in *Symbionics* controls: a party who misses the deadline to file an appeal due to the inattentiveness of counsel should not be found to have committed excusable neglect, even when there is no prejudice to the opposing party, no lengthy delay, and no indication of bad faith. The district court's misapprehension regarding this established precedent constitutes an abuse of discretion and this Court should reverse the grant of the motion for extension and dismiss Central Radio's appeal (Record No. 13-1996) for lack of jurisdiction.

## II.    THE APPLICABLE SIGN REGULATIONS DO NOT VIOLATE THE FIRST AMENDMENT.

A challenge to the constitutionality of local sign regulations based on the First Amendment will be dismissed when the regulations are found to be content-

---

[9]    It is worth noting that the district court conducted no analysis with respect to the question of whether "injustice would otherwise result" if Central Radio's motion for extension were denied. This too shows that the trial court abused its discretion, by failing to "take into account judicially recognized factors constraining its exercise." *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993). However, we are mindful that the remedy for this sort of error would be a remand, to give the trial court an opportunity to adjudicate this necessary element of the "excusable neglect" inquiry. Because we believe all the relevant facts are known and that such a remand would involve the needless expenditure of additional resources, the City prays for a reversal of the grant of the extension rather than remand. *See*, *e.g.*, *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699, 704 (4th Cir. 1976) (where district court granted extension to allow late appeal but failed to properly assess "excusable neglect," remand, which would seem to be the proper procedure, was not ordered since appellate court was satisfied with the district court opinion and affirmed it, thus making remand "a useless formality").

neutral, are narrowly tailored to serve any substantial governmental interest, and ample alternative means of communication remain available. *Arlington County Republican Comm. v. Arlington County, Va.*, 983 F.2d 587, 593 (4th Cir. 1993). We address each of these three elements of the *Arlington County Republican Committee* test in turn.

A.    <u>The sign ordinance regulations are content-neutral.</u>

This Court employs a test under which any one of three prongs can be relied upon by the government in order to demonstrate that the challenged regulation is content-neutral:

(1)    The regulation is not a regulation of speech, but rather a regulation of the places where some speech may occur;

(2)    The regulation was not adopted because of disagreement with the message the speech conveys; or

(3)    The government's interests in the regulation are unrelated to the content of the affected speech.

*Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 366 (4th Cir. 2012) (citing *Covenant Media of S.C., Ltd. Liab. Corp. v. City of N. Charleston*, 493 F.3d 421, 433 (4th Cir. 2007)).  A review of the material facts demonstrates that all three methods of establishing content-neutrality are satisfied with respect to the Central Radio sign.

(1)     <u>The operative Sign Code regulations are based solely on size and location and have nothing to do with the message.</u>

Norfolk's Sign Code defines different sign types for the purpose of applying the regulations set forth therein.  (J.A. 255-260 at § 16-3).  The definition that describes the type of sign Central Radio seeks to display is a "wall sign."  A "wall sign" is:

> A sign fastened to the wall of a building or structure in such a manner that the wall becomes the supporting structure for, or forms the background surface of, the sign or a sign painted directly on the wall of the structure.

(J.A. 260).  The City's limitation on the maximum size of a wall sign is governed by the length of the building.  The applicable rule says that "Any property or businesses shall be permitted one square foot of sign surface area for each foot of building frontage facing a public street but not less than thirty-two (32) square feet."  (J.A. 276 at § 16-8.3).  In short, the sole factor that operates to limit the amount of wall signage is the dimension of "building frontage facing a public street."[10]

Thus it is inescapable that the restriction that the Sign Code places on wall signs in industrial districts is "not a regulation of speech, but rather a regulation of

---

[10]  We note that one aspect of Central Radio's challenge argues that the First Amendment prohibits a government from establishing a maximum size limit for some forms of visual speech while having no maximum for other forms.  (Br. of Appellants 17-27).  We respond to those arguments elsewhere in this brief.  Central Radio does not, however, challenge the constitutionality of the sliding-scale rule for wall signs, which allows larger signs on properties with more lot frontage.

23

the places where some speech may occur." *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 366 (4th Cir. 2012). For this reason, the Sign Code provision that applies to Central Radio's sign meets the first content-neutral standard.

(2)   <u>There is no evidence that the sign regulation was adopted because of a disagreement with any particular message.</u>

A regulation that prohibits certain *messages* can be found to violate the First Amendment. *See*, *e.g.*, *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 533 (1980) (striking down as unconstitutional a state rule prohibiting utility companies from including messages in its mailings to customers if the messages discussed "opinions or viewpoints on controversial issues of public policy," since the rule was not narrowly tailored to protect a legitimate governmental interest).

With respect to the instant case, there are no facts to suggest that the Norfolk City Council's purpose behind its adoption of the size and location limits that apply to wall signs in industrial zoning districts targets any particular message. Instead, the facts show that the reason for imposing a size limit is based, in part, on its desire to "reduce the distractions, obstructions and hazards to pedestrian and auto traffic caused by excessive number, size or height…." (J.A. 255 at § 16-1). The rules do not regulate the *message* Central Radio desires to display and surely do not prohibit it.

24

Furthermore, nothing in the record suggests that there was any issue with the message on Central Radio's sign. The verbal citation and the two written citations make no mention of any problem with the message. (J.A. 228-229, 326, 438-439). To the contrary, one of the inspectors, Ms. Garrett, explained that she empathized with Central Radio and "felt sorry for them." (J.A. 554-555). All she wanted was for the owners to "come into compliance with the code." *Id.* And the other inspector, Mr. Tanner, testified that he does not look at the message when he evaluates a sign, stating "I don't care what the banner really says." (J.A. 1179). None of the City personnel involved with this sign expressed any disagreement with Central Radio's message. For these reasons, the Sign Code limitations that constrain Central Radio's sign meet the second content-neutral standard of *Wag More Dogs*.

      (3)    <u>The City's statement of its interests in regulating the size and location of wall signs in industrial districts is unrelated to any content such signs might contain.</u>

The Norfolk City Council has expressed its purposes for adopting the Sign Code. (J.A. 255 at § 16-1). They include promoting public safety, enhancing aesthetics, and reducing the likelihood that excessively tall, large, bright, or unsafe signs will interfere with pedestrian and automobile traffic. *Id.* These concerns are consistent with those cited by other localities. *See*, *e.g.*, *Arlington County Republican Comm. v. Arlington County, Va.*, 983 F.2d 587, 594 (4th Cir. 1993)

(finding that promoting "aesthetics and traffic safety" are substantial government interests); *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) (noting that "[u]nlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation").

Absent from the purpose statement is any inkling that the City Council desires to regulate the *content* of the messages that may appear on a sign. It expresses no concerns about signs that might be offensive, immoral, obscene, or controversial—all terms that invite an assessment of content. Instead, the list of harms that signs might pose and which are sought to be diminished by the regulations of the Sign Code are all issues that may arise *irrespective of the content of the message* any particular sign might carry.

Where a sign ordinance is not enacted in order to stymie a particular, disfavored message, it is undeniably content neutral. *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 368 (4th Cir. 2012). The Norfolk City Council's purpose in enacting the Sign Code squarely satisfies this test, wherefore the City's interests which underpin its Code clearly satisfy the third content-neutral standard of *Wag More Dogs*.

Not only does the record indicate that the Sign Code meets all three of the content-neutrality tests established by this Court, but it also meets the general test

of content neutrality provided by the United States Supreme Court: "Laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The record in the instant case does not indicate that the City's size rule which prevents Central Radio from displaying its 375 square foot wall sign is content-based.

      B.    <u>The Sign Code regulations are narrowly tailored to serve a substantial governmental interest.</u>

Even a content-neutral regulation, such as the one that applies to the Central Radio sign, can run afoul of the First Amendment if it is not narrowly tailored to serve a substantial governmental interest. *Arlington County Republican Comm. v. Arlington County, Va.*, 983 F.2d 587, 593 (4th Cir. 1993). As mentioned previously, Norfolk has codified a statement of the problems that signs typically pose. (J.A. 255 at § 16-1). Regulating signs in order to reduce the impact of those problems is a substantial governmental interest. *Covenant Media of S.C., Ltd. Liab. Corp. v. City of N. Charleston*, 493 F.3d 421, 433 (4th Cir. 2007). No

constitutional violation exists when a city regulates merely the physical characteristics of signs. *Id.*

The provisions of the Sign Code that regulate Central Radio's sign only limit the maximum size and its location. These provisions allow all wall signs a maximum area of one square foot of sign area for each foot of building frontage. (J.A. 276 at 16-8.3(c)). They also restrict all signs to the same location: facing the "street or lot line from which the allotment is computed." (J.A. 266 at § 16-6.8(c)). These rules help accomplish some of the stated purposes of the Sign Code, including curtailing excessively large signs so as to create a more attractive economic and business climate within industrial areas and reducing distractions. (J.A. 255 at § 16-1). In fact, the limitations practically epitomize narrow tailoring: addressing the problem of excessive size by imposing a cap on the maximum size allowed and addressing indiscriminate placement by restricting where the sign can be placed.

(1)    The City demonstrated that the Sign Code serves a legitimate governmental interest.

Central Radio's efforts to show that the Sign Code is not narrowly tailored to the degree required by the First Amendment are predicated on two theories. First, it claims that the City failed to prove that its ability to reduce the deleterious effects that unlimited signage would wreak on traffic safety or aesthetics would be impaired if the Sign Code did not exist. (Br. of Appellant 37). Because of this

28

failure, it argues, the Sign Code is not tied to a legitimate substantial governmental interest, wherefore it is unconstitutional.  (Br. of Appellant 36-37).

The facts do not support this theory.  The City submitted the governing body's written, published explanation of why it adopted the regulations in the Sign Code and the district court took judicial notice of it.  (J.A. 349-350) (recognizing the Sign Code, including § 16-1, entitled "Purpose statement").  With regard to Central Radio's sign in particular, the trial court heard evidence that the sign could be seen from three blocks away, in both directions up and down Hampton Boulevard.  (J.A. 303-304, 322).  An employee of Central Radio testified that, if he is outside, he sees motorists "honk their horns, yell things in support to us, wave" in response to the sign.  (J.A. 304).  This evidence tended to show that the sign was a distraction to drivers.[11]  (J.A. 1212); s*ee also Brown v. Town of Cary*, 706 F.3d 294, 305 (4th Cir. 2013) (holding that honking a horn in response to seeing a sign, even just once, is evidence that the sign is a distraction).

In order to rebut the City's showing that large signs, and the Central Radio sign in particular, cause distractions, Central Radio relies upon statements of witnesses who have no knowledge about the situation.  (Br. of Appellant 32-33).

---

[11]  Central Radio brushes aside this evidence of distracted motorists because it infers that the drivers *agreed* with the sign's message.  (Br. of Appellant 36-37).  Unlike Central Radio, we do not believe the First Amendment limits a local government to regulating only those distracting signs that contain disagreeable or disliked messages.  Furthermore, the authority cited by Central Radio, *id.*, does not support its dismissive approach to this evidence.

One City employee stated that we was unaware of any aesthetic problems posed by the sign (J.A. 628), and a second testified that he did not know about the traffic safety problems the sign was causing (J.A. 979). Central Radio's identification of two people who did not know about motorists honking, waving, and yelling at Central Radio's employee as they drove by does not rebut the City's evidence of distraction.

The remainder of Central Radio's rebuttal evidence consists of a statement by the author of a book about signage regarding *business* signs (J.A. 194) and a published statement by a traffic engineer addressing *billboards* (J.A. 189). In light of the fact that Central Radio's sign is neither a business sign nor a billboard, these writings are irrelevant to the question of whether the on-premises wall sign bearing a political message was a distraction.

Before we move to a discussion of Central Radio's second theory of why Norfolk's Sign Code is not narrowly tailored to protect its governmental interest, we wish to take time to formally oppose its request that this Court create a new burden of proof that, heretofore, has not existed in the Fourth Circuit. They assert that the City must submit actual evidence to prove that the Sign Code's regulations further a substantial governmental interest. (Br. of Appellant 29-32). This is a misunderstanding of the law.

It is true that the government defending a restriction imposed on speech can be required to *demonstrate* that its rule "serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993). In *Edenfield*, the Supreme Court defines the test as follows:

> It is well established that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of *justifying* it." This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must *demonstrate* that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.

*Id.* at 770-71 (citation omitted) (emphasis added). Central Radio's citation to this Court's *en banc* decision in *Davenport v. City of Alexandria, Va.*, 710 F.2d 148 (4th Cir. 1983), describes exactly the same standard:

> It is well settled that in a suit alleging the infringement of speech, the governmental defendant bears the burden of *demonstrating* that its enactment is narrowly tailored to the accomplishment of a compelling state interest.

*Id.* at 152 n.8. (emphasis added). The law simply does not require what Central Radio demands: that the City is compelled to present "actual, objective evidence" that applying the Sign Code to Central Radio's sign will reduce the harms that it knows to be caused by unregulated, unlimited signs. (Br. of Appellant 32). All that is required is that the government "justify" or "demonstrate" this linkage.

It bears noting that Central Radio's attorneys advanced this very same argument (on behalf of a different client) just last year, and this Court rejected it.

31

In representing a business-owner seeking to invalidate the sign ordinance in Arlington County, Virginia, the Institute for Justice claimed that the regulations failed under the applicable level of constitutional scrutiny because the County neglected to put on evidence that Arlington's sign rules advance its goals. *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 365 n.3 (4th Cir. 2012). Dismissing the argument, this Court wrote:

> We reject at the outset Wag More Dogs' literally unprecedented contention that the district court improperly dismissed the case absent Arlington and Artman's production of evidence justifying the Sign Ordinance's restrictions. Wag More Dogs concedes that, were we to accept the proposition, dismissal would effectively never be appropriate in the context of a First Amendment challenge, as the inquiry starts and stops with facts alleged in the plaintiff's complaint and gives the government no opportunity to test the plausibility of the claim by producing evidence. Unsurprisingly, Wag More Dogs cites no authority supporting this bold argument.

*Id.* As they have done in the instant case, the plaintiff's counsel cited to the *Edenfield* case in an effort to lend credibility to its position. *Id.* Correctly seeing this argument as a bit of an overreach, this Court explained that "the cases [plaintiff] references stand for nothing more than the unremarkable principle that 'the party seeking to uphold a restriction of commercial speech carries the burden of justifying it....'" *Id.* We ask the Court to—once again—rebuff this request to establish a higher burden of proof, requiring *evidence* rather than a *demonstration* of how content-neutral speech regulations relate to the governmental interests they promote.

32

Even if this Court were to adopt this new burden of proof, the facts in the instant case plainly show that the City did provide evidentiary proof. That evidence consisted of documentation describing the legislature's findings about the dangers of signs and the purposes of the Sign Code (J.A. 255) as well as testimony explaining how Central Radio's sign caused motorists to be distracted such that they yelled, waved, and beeped their car horns (J.A. 304).

(2)    The Sign Code is not impermissibly underinclusive.

The second theory under which Central Radio questions the narrow tailoring of the Sign Code argues that it is unconstitutionally underinclusive. A plaintiff may seek to prove that the expressed governmental interest is actually not a valid interest at all by offering evidence that the government grants certain exemptions that would fly in the face of promoting its stated, content-neutral purposes. *City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994). This approach targets the linkage between the regulation and the substantial governmental interest by arguing that the regulation cannot meaningfully advance the governmental interest if it is not applied uniformly with respect to different signs that present the same sorts of harms.[12]

---

[12] Because it relies on evidence of differential treatment of signs, this argument might be confused with Central Radio's selective enforcement claim. However, the two are legally distinct. The inconsistency argument implicates the First Amendment. The selective enforcement claim arises under the Fourteenth Amendment and questions whether similarly-situated persons are being treated

In the case under review, Central Radio points out that some forms of visual speech—such as flags, murals, and works of art—are not regulated by the Sign Code. (Br. of Appellant 38). But a wall sign, like the one it wants to display, *is* subject to location and size limits. *Id.* Central Radio presents this "mismatch" as proof that Norfolk's sign regulations are not narrowly tailored to advance its stated governmental interest. *Id.*

Showing that the Sign Code fails to regulate all methods of visual expressive speech is not proof that it is unconstitutionally underinclusive. Nothing in the First Amendment demands that the rules must encompass and restrict *every* form of visual expression. *See*, *e.g.*, *Brown v. Town of Cary*, 706 F.3d 294, 304 (4th Cir. 2013) (finding that sign ordinance that exempted public art and holiday decorations from regulations was not unconstitutional).

> "The concept of underinclusiveness needs to be approached with some caution, however. Holding an underinclusive classification to violate the First Amendment can chase government into overbroad restraints of speech. Thus, a speech restriction with a limited reach is not doomed to fail First Amendment scrutiny."

*Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 345 (4th Cir. 2005) (citing *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (stating that "We do not...agree that the failure to regulate all speech renders the statute fatally underinclusive")).

---

differently for some unlawful purpose, notwithstanding the fact that the regulations might past muster under the First Amendment. A complete discussion of Central Radio's selective enforcement claim appears below, in section IV of this Argument.

Central Radio provides no precedential authority that would require that the Sign Code be struck down because it fails to impose a size limit on expressive displays such as works of art and murals. For these reasons, we ask that the Court resist its invitation to reverse the trial court's ruling on this issue.

C.    Ample means of communication other than displaying a 375 square foot sign are available to Central Radio.

Even though restrictions on speech may be content neutral and may be narrowly tailored to serve a substantial governmental interest, they still must leave open ample channels of alternative communication. *American Legion Post 7 v. City of Durham*, 239 F.3d 601, 609 (4th Cir. 2001). Appling this rule in a recently-decided case, this Court has found that a sign code that did not allow a 960 square foot sign satisfied the "ample channels of alternative communication" standard because it did allow a 60 square foot sign. *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 363, 369 (4th Cir. 2012).

In Central Radio's case, the Sign Code allows for as much as 214 square feet of signage on the Property. It could install a 90 square foot wall sign (J.A. 276, 428-429), a 64 square foot freestanding sign (J.A. 276, 742-743, 952-955), and a 60 square foot temporary sign (J.A. 425, 680-681). As much as 92 square feet of the signage could be oriented to face Hampton Boulevard. (J.A. 952-953 (one face of the freestanding sign), 680-681 (temporary sign)). Because Central Radio can display a variety of signs—each of which can be 60 square feet or larger—its claim

35

that the Sign Code forecloses ample channels of alternative communication rings hollow.

Furthermore, Central Radio cites no evidence to bolster its argument. It did not show that placing the wall sign on the *front* of the building would have been an inadequate alternative, despite evidence that several signs describing Central Radio's dealership authorizations are located there. (J.A. 323). Nor is there evidence that a smaller sign would not work just as well as the 375 square foot one. Central Radio presented *arguments* to the trial court on this issue (J.A. 1212), but any *evidence* to support the claim is notably absent.

We can find no controlling legal authority that would contradict this Court's conclusion in *Wag More Dogs* that a sign ordinance which allows the display of any sort of message on a sign, subject only to limits on the size and location, leaves open ample channels of alternative communication. The sign regulations applicable to Central Radio's Property pass this test.

Applying the test set forth in *Arlington County Republican Committee*, a review of the entire record shows that the district court was correct to dismiss Central Radio's First Amendment challenge because Norfolk's Sign Code is content-neutral, is narrowly tailored to serve a substantial governmental interest, and leaves open ample alternative means of communication.

36

D.  The existence of a limited number of exemptions from some of the Sign Code's requirements does not render the ordinance content-based.

Much of Central Radio's opening brief is dedicated to its attack on the content-neutrality of the Sign Code.  Relying principally on decisions from other federal circuits, they argue that the City's failure to impose a maximum size limit on all forms of visual speech to the same extent as that imposed on its wall sign proves that the ordinance is content-based, since the analysis of whether the visual speech is a an "exempt" sign, or is even a "sign" in the first place, requires the City to review the sign's content.  (Br. of Appellant 17-27).  In fairness, Central Radio acknowledges that this interpretation marks a deviation from the well-established approach used in the Fourth Circuit.  (Br. of Appellant 19-20).  For the following reasons, we believe that the facts of this case do not support altering the existing standards for evaluating content-neutrality.

The decisions from other circuits that Central Radio relies upon are exemplified best by *Neighborhood Enters., Inc. v. City of St. Louis*, 644 F.3d 728 (8th Cir. 2011), *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1262 (11th Cir. 2005), and *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246 (9th Cir. 1988). The opinion in each of these cases holds that a local sign code is content-based if it allows other visual speech displays to be larger than the one the plaintiff desires. *Neighborhood Enters., Inc.*, 644 F.3d at 736-37.  (noting that "an object of the

37

same dimensions as [the plaintiff's] 'End Eminent Domain Abuse' sign/mural would not be subject to regulation if it were a '[n]ational, state, religious, fraternal, professional and civic symbol[ ] or crest[ ], or on site ground based measure display device used to show time and subject matter of religious services.'"); *Solantic, LLC*, 410 F.3d at 1266 (holding that "because some types of signs are extensively regulated while others are exempt from regulation based on the nature of the messages they seek to convey, the sign code is undeniably a content-based restriction on speech."); *Nat'l Adver. Co.*, 861 F.2d at 249 (holding that "Because the exceptions to the restriction on noncommercial speech are based on content, the restriction itself is based on content" and is therefore subject to strict scrutiny.). One could simplify the test adopted in the Eighth, Ninth, and Eleventh Circuits as follows:  unless the sign code regulates all forms of visual speech and establishes the same limits on size for all of them, it shall be deemed "content-based."  For the following reasons, we believe such a approach is inconsistent with the Supreme Court's jurisprudence of the First Amendment and is unworkable in practice.

        (1)    <u>The United States Supreme Court has never adopted such a strict standard for signs.</u>

One of the landmark cases defining unconstitutional underinclusiveness is *City of Ladue v. Gilleo*, 512 U.S. 43 (1994).  In that case, the Supreme Court reviewed a sign code that imposed a ban on signs throughout the entire city but created exemptions that allowed signs containing certain messages, including those

identifying schools, churches, not-for-profit organizations, and all commercial signs located in commercial or industrial zoning districts. *Id.* at 46-47. The Court struck down the ban, holding that it unconstitutionally targeted those signs which contained certain messages. *Id.* at 55.

The Supreme Court faced a similar issue in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). In *Metromedia*, the City of San Diego adopted a prohibition against all billboards. *Id.* at 493-96. The ordinance created some exemptions from this blanket prohibition, one of which allowed on-site, *commercial* billboards. *Id.* at 494-95, 513. However, on-site *noncommercial* billboards were not exempt from the ban. *Id.* at 495-96, 513.

A plurality of justices decided that San Diego's ordinance violated the First Amendment for two reasons. First, the prohibition against on-site noncommercial billboards did not extend to on-site commercial billboards, thereby unconstitutionally restricting noncommercial speech in an manner that was not justified by the city's stated concern about distracting and unattractive sign displays. *Id.* at 513. Second, the ordinance permitted billboards to carry some noncommercial messages (e.g. religious symbols, news items, and temporary campaign signs) while other messages were prohibited. *Id.* at 515. The four justices in the plurality believed that San Diego's law unlawfully prescribed "appropriate subjects for public discourse." *Id.* at 514-515.

Five of the nine justices did not concur with this rationale.[13]  Describing the

plurality's way of thinking as a "bizarre twist of logic," Chief Justice Burger, in

dissent, presciently explains the Hobson's choice that every local government

would be presented with if the requirement of content-neutrality were to be

interpreted as rigidly proscribing any consideration of any message for any reason:

> [T]he plurality has given every city, town, and village in this country
> desiring to respond to the hazards posed by billboards a choice as
> previously noted, between two equally unsatisfactory alternatives:
>
> > (a)  banning all signs of any kind whatsoever, or
> >
> > (b)  permitting all "noncommercial" signs, no matter how
> > numerous, how large, how damaging to the environment,
> > or how dangerous to motorists and pedestrians.
>
> Otherwise, the municipality must give up and do nothing in the
> face of an ever-increasing menace to the urban environment.

*Id.* at 564 (Burger, J., dissenting).  The Chief Justice concludes his dissent with the

following:

> As Justice Stevens cogently observes, the plurality, "somewhat
> ironically, concludes that the ordinance is an unconstitutional
> abridgment of speech *because it does not abridge enough speech*."
> *Ante*, at 2909 (emphasis added). The plurality gravely misconstrues
> the commercial-noncommercial distinction of earlier cases when it
> holds that the preferred position of noncommercial speech compels a
> city to impose the same or greater limits on commercial as on

---

[13]  Two justices agreed with the ruling declaring San Diego's regulations
unconstitutional, but on the theory that the practical effect was to create a total ban
against all billboards.  *Id*. at 525 (Brennen, J., concurring).  As was confirmed by
*Ladue*, a total ban on certain signs, where the determination is based on content, is
unconstitutional.

noncommercial speech. The Court today leaves the modern metropolis with a series of Hobson's choices and rejects basic concepts of federalism by denying to every community the important powers reserved to the people and the States by the Constitution. This is indeed "an exercise of raw judicial power," *Doe v. Bolton*, 410 U.S. 179, 222, 93 S.Ct. 739, 763, 35 L.Ed.2d 201 (1973) (White, J., dissenting), and is far removed from the high purposes of the First Amendment.

*Id.* at 569 (Burger, J., dissenting).

Neither *Metromedia* nor *Ladue*—nor any other Supreme Court decision— holds that the First Amendment forbids a government from imposing different size limits on different sign types, even if the content of the sign is used to determine the sign's typology. The circuits that subscribe to the minority rule expressed in *Neighborhood Enterprises* have taken a leap of jurisprudence that the Supreme Court has not. And earlier this year, when this Court deliberated whether to take that leap and break from the majority, it decided not to. *Brown v. Town of Cary*, 706 F.3d 294, 302 (4th Cir. 2013).

(2)    The First Amendment does not require the City to regulate all forms of visual speech identically.

Central Radio makes much of the fact that the Sign Code does not regulate the size of flags (other than corporate flags),[14] emblems, and works of art. (Br. of Appellant 17, 20-27). These forms of visual speech are excluded from the definition of "sign" contained in the City's zoning ordinance. (J.A. 250). Central

---

[14] Corporate flags are subject to size and location limits. (J.A. 261 at § 16-5.2(a)(3)).

41

Radio argues that the City's failure to capture these forms of visual speech under the umbrella of the Sign Code renders it content-based. *Id.*

But the First Amendment does not require a city to regulate visual speech with absolute, suffocating completeness. Localities may stop short of fully accomplishing their objectives without running afoul of the First Amendment. *Posadas de Puerto Rico Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 342 (1986); *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359, 368-69 (4th Cir. 2012). A sign ordinance can prohibit some unattractive signs while exempting others without violating the First Amendment. *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 811 (1984). It can also exempt public art and holiday decorations without abridging the freedom of speech. *Brown v. Town of Cary*, 706 F.3d 294, 304 (4th Cir. 2013). Even though these forms of visual expression are distinguished from those that are regulated, like signs, based on their appearance, "the distinctions themselves are justified for reasons independent of content." *Id.*

In the present case, the district court ruled that the exemptions Central Radio complains about did not convert the Sign Code to a content-based restriction because the attributes that distinguish them have nothing to do with the content of the message, noting that "most flags, emblems, and artwork either lack text or

present text that is superfluous to the display." (J.A. 1209-1210). This is a rational, accurate, and obvious conclusion.

Furthermore, Central Radio's three arguments opposing the trial court's conclusion are unpersuasive. First, it claims the district court's generalization about the lack of text is false, citing three U.S. state flags that include some text. (Br. of Appellant 21). This proves nothing, however, since the trial court's characterization about the appearance of most flags was not limited to state flags. Flags of *all* governmental organizations lie beyond the scope of the Sign Code. (J.A. 250).

Second, Central Radio says that flags of some organizations are excluded from the definition (*e.g.* the Salvation Army and Notre Dame University) while others are captured by it (*e.g.* the Red Cross and Duke University). (Br. of Appellant 22). Unfortunately, Central Radio provides absolutely no evidence to support the notion that flags of the Salvation Army and Notre Dame University would be exempt. And common sense suggests that these institutions are quite likely to be incorporated, making their flags subject to the very same "corporate flag" regulations that presumably would govern the size and location of the Red Cross and Duke University flags. (J.A. 261 at § 16-5.2(a)(3)).

Lastly, Central Radio cites a comment by a deponent about the importance of the American flag as evidence of the Sign Code's lack of content neutrality.

(Br. of Appellant 21).  Because the statement was made by a witness who was not testifying as a representative of the City on the topic of why the City chose to excluded certain forms of visual speech from the definition of "sign" (J.A. 784, 799-800),[15] because the City objected to the question on precisely this basis (J.A. 1012), and because the objection has never been waived (*see* Fed. R. Civ. P. 32(d)(3)), the comment has no probative value on the question of content neutrality.  And in the face of the City's affirmative evidence explaining the legislature's purpose in adopting the Sign Code (J.A. 255 at § 16-1), the comment that Central Radio relies upon is surely *not* a material fact not in dispute, wherefore it could not support the company's motion for summary judgment.  Fed. R. Civ. P. 56(c).

Simply put, the accommodations that the Sign Code makes for certain forms of visual speech do not undermine its content-neutrality, since there are no material facts showing that Norfolk "has adopted a regulation of speech because of

---

[15] Although Central Radio included the witness' entire deposition as an attachment to its Memorandum in Opposition to Defendant's Motion for Summary Judgment, it neglected to include the exhibits that were admitted during the deposition, including "Newcomb Deposition Exhibit No. 1" (*see* J.A. 799), which defined the scope of topics that this witness was presented as having knowledge of, in accordance with Fed. R. Civ. P. 30(b)(6).  "Newcomb Deposition Exhibit No. 1", which both parties are in possession of, clearly shows that this witness was *not* designated by the City to answer questions about the Norfolk City Council's reasons for adopting the Sign Code's regulations.

disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Taking a moment to contemplate the absurdity that would be created by the rigid constitutional interpretation urged by Central Radio, it is no wonder that neither the Fourth Circuit nor the United States Supreme Court have adopted the *Neighborhood Enterprises* approach.   If it were true that the First Amendment demands that an ordinance allowing signs of a certain size based on one type of message must also allow signs of the same size for every other type of message, then there could be no differentiation in sign sizes *at all*.  Under Central Radio's theory, the fact that a "freestanding sign" is allowed to have 64 square feet of area means that a "home security sign" must be allowed to be just as large, since the fact that the "home security sign"[16] carries a particular message about home security would be a unconstitutional content-based distinction.  Or, the fact that a "mural" is not subject to a maximum size limit means that a "directory sign" must likewise be allowed citywide with no maximum size limit, since the fact that the "directory sign" carries a particular message about the "names and locations of occupants or the use of a building" would be an unconstitutional content-based distinction.  (J.A. 256-257) (defining "directory sign" and "mural").

---

[16]   The Sign Code restricts the size of a "home security sign" to no more than one square foot in area.  (J.A. 261 at § 16-5.2(a)(4)).

Even if the practical difficulties could be overcome, the idea that regulating all visual expression would be *legally* feasible is doubtful. Visual expressive displays, including those defined as "signs," that are located on state or federal property cannot be regulated by local zoning authority. *See Cuccinelli v. Rector, Visitors of Univ. of Va.*, 283 Va. 420, 426, 722 S.E.2d 626, 630 (Va. 2012) (the Commonwealth and its agencies are not bound by statutes of general application); 1984-85 Va. Op. Att'y Gen. 91, 1985 WL 192263 (1985) ("absent statutory exemption, zoning and planning regulations will be construed to apply to facilities of governmental bodies of equal or lesser authority than the local government seeking to apply them, such as other political subdivisions and subordinate agencies of counties, cities and towns"). This is the reason why large signs— larger than would be permitted under the Sign Code—lawfully exist just a few blocks north of Central Radio's Property at Old Dominion University. (J.A. 45-46, 53, 59, 95, 345, 347). Those signs are situated on land owned by the Commonwealth of Virginia, *see* Va. Code Ann. § 23-49.13 (1950), and are therefore beyond the regulatory control of the City of Norfolk (J.A. 974).

Furthermore, signs that were erected before the City's current sign regulations were imposed are considered to be "vested" under state law, meaning that the City cannot force them to comply with newer, more-restrictive sign rules. *See* Va. Code Ann. § 15.2-2307 (1950). In other words, state law mandates that

46

older signs that are too large or too tall to meet current regulations (i.e. "nonconforming") must be tolerated, at least until they are abandoned. *Id.* These legal constraints mean that cities in the Commonwealth that might try to take an all-inclusive approach to regulating visual speech will have some degree of underinclusivity thrust upon them, making Central Radio's strict reading of the First Amendment all the more unworkable.

Perhaps because of the bizarre results that would be caused by such a strict, formalistic approach or because such a rule tramples federalism under the boot of "raw judicial power", as articulated by Justice Berger in his *Metromedia* dissent, this Court has previously decided not to adopt the interpretation Central Radio prays for. *See Wag More Dogs*, 680 F.3d at 368 (the mere fact that signs of different types are regulated with different size limits "is not an augur of constitutional doom"). Much sounder is the rule that prevails in the Fourth Circuit and the majority of other federal circuits, which allows a government to regulate signs differently based on the *classification* of the message, not the content.

Applying these well-established standards, the rules in Norfolk's sign ordinance that restrain the size and location of Central Radio's sign are not unconstitutional, since the purposes behind the limitations are solely related to the governing body's stated concerns about distracting signs. (J.A. 255 at § 16-1). With these purposes in mind, the decision to adopt a different regulatory approach

47

for different classes of signs makes perfect sense.  How "readable" a message is can impact traffic safety.  (J.A. 407).  But the content of the message would not. *Id.*  A sign with *no* words typically takes less time to read than a sign *with* words, meaning that a viewer will likely spend more time reading a wordy sign than a wordless one.  Thus, the City's different regulatory approach to wall signs like Central Radio's, as compared to wordless displays (like murals and flags), can be explained by the dominance of legible characters, without making any judgment about the *message* the characters spell out.

In sum, nothing in this case suggests that the size and location restrictions that apply to Central Radio's wall sign are imposed in order to prohibit any particular message.  The company presents no evidence that the Sign Code's restrictions would operate any differently if they swapped out the string of words on their sign for some other string of words.  This confirms that the City's sign ordinance is content-neutral as a matter of law.

## III.  THE SIGN CODE DOES NOT ALLOW FOR DISCRETION IN THE APPROVAL OR DENIAL OF SIGN PERMIT APPLICATIONS.

When a government requires someone proposing a certain form of expressive speech to first secure a permit, the regulations must include a time limitation for approval or denial of the request whenever the decision process is based on a discretionary review of the content of the proposed speech.  *Freedman v. State of Md.*, 380 U.S. 51, 58-59 (1965).   This rule is imposed to guard against

48

the danger that free speech will be suppressed for an indeterminate amount of time while the permittor contemplates how it will exercise its judgment. *Id.* at 58-59. That concern does not exist, however, when the decision on the permit application is purely ministerial, involving no element of discretion or judgment. In those instances, the First Amendment does not require a defined time limit for permit decisions. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322-24 (2002).

Notwithstanding these legal principals, Central Radio insists that the failure to include a time limit on the process for granting a sign certificate renders the Sign Code unconstitutional. (Br. of Appellant 48-49). It also argues that the Sign Code lacks standards, allowing for unbridled discretion in violation of the First Amendment. (Br. of Appellant 43-48). These arguments fail for the following reasons.

A.     Because the Sign Code is content-neutral, no time limit is required.

First, as explicated above, the First Amendment only requires a time period be included as part of the review process if it is applying a content-*based* standard, not a content-*neutral* one. *Covenant Media of S.C., Ltd. Liab. Corp. v. City of N. Charleston*, 493 F.3d 421, 435 (4th Cir. 2007). And as argued *supra*, Norfolk's Sign Code clearly qualifies as content-neutral under the Fourth Circuit's *Covenant Media* and *Wag More Dogs* standard. Although the Sign Code does not contain a time limit for granting sign permits, it is not required to.

Central Radio's claim presents no avenue for relief that is independent of its attack on the Sign Code's content-neutrality. Those challenges succeed or fail in concert. And because the Sign Code qualifies as content-neutral, the assertion that it creates an unconstitutional prior restraint is without merit.

B.  <u>The Sign Code does not accommodate or allow for unbridled discretion in the granting of sign permits.</u>

On brief, Central Radio attempts to show how the Sign Code lacks adequate standards to protect against unbridled discretion by those tasked with granting permits for new signs. (Br. of Appellant 43-48). Entirely absent from its analysis is any discussion of the language in the Sign Code itself. Instead of citing sections of the Code that purport to allow for an impermissible degree of discretion, it relies upon misstatements by a deponent witness. *Id.*

Whenever a statute regulating protected behavior is being assessed for its compliance with the strictures of the Constitution, the reviewing court must be able to ascertain what exactly the statute regulates. The tools the Court must use to determine whether the Sign Code lacks the constitutionally necessary standards are known. They are the well-honed rules of statutory construction. "When interpreting statutes we start with the plain language." *U.S. Dep't of Labor v. N.C. Growers Ass'n*, 377 F.3d 345, 350 (4th Cir. 2004). The first canon of construction states that "courts must presume that a legislature says in a statute what it means and means in a statute what it says." *Stone v. Instrumentation Lab. Co.*, 591 F.3d

50

239, 243 (4th Cir. 2009) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).  When a statute is unambiguous, "this first canon is also the last: 'judicial inquiry is complete.'"  *Id.*

In order to assess what standards constraining discretion are in the Sign Code, we look to the words contained in the Sign Code itself.  They are plain and unambiguous:

> If the proposed sign is in compliance with standards contained in this chapter and all other applicable provisions in this ordinance, the zoning administrator *shall* issue a sign certificate for the proposed sign.

(J.A. 264 at § 16-5.4) (emphasis added).  The Sign Code's direction regarding *denials* of sign certificates is equally simple and straightforward, prohibiting the grant of a sign certificate when the proposed sign is not permitted in the zoning district where it is proposed, fails to meet the general standards set forth in section 16-6, or fails to meet the specific limitations of the applicable zoning district.  (J.A. 273 at § 16-8).  In short, the City has *no discretion* to deny an application that satisfies the content-neutral sign regulations, wherefore there is no unconstitutional prior restraint.

Perhaps mindful of the reality that the Sign Code expressly *requires* the grant of any compliant sign application, Central Radio crafts its arguments out of deposition responses given by the City's Director of Planning, Frank Duke, that contradict the Sign Code.  For example, Mr. Duke stated that the sign in question

51

was a "temporary sign." (J.A. 680). But a review of the definitions in the Sign Code reveals that it is, in fact, a wall sign. (J.A. 260). He also expressed uncertainty responding to questions about hypothetical signs that were verbally described to him by the inquiring attorney. (J.A. 657, 682, 685, 700-701).

In the end, none of Mr. Duke's responses are helpful to a court attempting to judge the Sign Code's permit requirement. After, all, a government official does not have the power to "interpret" a statute to mean something other than what is expressed in its plain language. *See*, *e.g.*, *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (holding that state law prohibiting any corporation from making contributions or expenditures for a "political purpose" cannot be read so as to *allow* such contributions, even though evidence showed that state officials had interpreted the law so that the prohibition did not apply to corporations only engaged in issue advocacy). Under Virginia law, courts afford respect to an interpretation espoused by an official when he is the person charged with enforcing the regulation and has demonstrated a "consistent construction" of the regulation in question. *Bd. of Zoning Appeals ex rel. County of York v. 852 L.L.C.*, 257 Va. 485, 489, 514 S.E.2d 767, 770 (Va. 1999). However, if that interpretation is at odds with the plain language used in the ordinance as a whole, then the reviewing court must conclude that it is plainly wrong and ignore it. *Id.*

52

Norfolk's Sign Code leaves no room for disagreement about what signs will or will not be granted a permit:  any application for a sign that meets the size and location limits for the applicable sign type and the applicable zoning district "shall" be issued.  (J.A. 264 at § 16-5.4).  Because the permittor has no opportunity to deny an application that satisfies the content-neutral regulations, there is no risk that an applicant's right to free speech will be constrained because of the message he proposes to display.

## IV.  THE CITY'S COMPLAINT-BASED ENFORCEMENT PROCESS IS NOT UNCONSTITUTIONAL.

### A.  The complaint-based approach does not violate Central Radio's right to equal protection under the Fourteenth Amendment.

A violation of the constitutional right to equal protection can be proven when the plaintiff shows both that the enforcement process "had a discriminatory effect and that it was motivated by a discriminatory purpose."  *Wayte v. United States*, 470 U.S. 598, 608 (1985); *see also Oyler v. Boles*, 368 U.S. 448, 456 (1962).  The facts alleged in the complaint must be sufficient to satisfy each element of the claim.  *Veney v. Wyche*, 293 F.3d 726, 731 (4th Cir. 2002).  "A violation of the Equal Protection Clause still requires a showing of clear and intentional discrimination."  *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 825 (4th Cir. 1995).  Simply alleging, or even proving, that similarly situated people were treated differently by the local government fails to state a

53

constitutional violation as a matter of law. *Id.* As common sense would suggest, merely demonstrating that the government failed to prosecute other, similarly-situated lawbreakers that it had *no knowledge of* is not sufficient. *Oyler*, 368 at 456.

Central Radio's claim that the City's citation of its illegal sign was an exercise in selective, discriminatory enforcement fails because evidence to prove the *prima facie* elements is lacking. Although it identified several large signs that were on display around the City, (J.A. 59-79),[17] it never showed that the City had received complaints about any of these other signs, at least not until Central Radio listed them in its pleading filed on August 28, 2012. (J.A. 6, 25, 26). Also, the City's enforcement of the Sign Code operates on a complaint-based system, where inspectors investigate those signs that citizens have complained about. (J.A. 392-393, 399-400, 427). Sign enforcement is not accomplished with patrols, where inspectors drive through the city looking for violations. (J.A. 392). Not only is there no evidence to show that enforcement staff ignored these other signs, there is no reason to believe enforcement staff even knew about them prior to the complaint being filed.

---

[17] A number of photographs of other signs were attached the Central Radio's Motion for Summary Judgment (J.A. 80-99), however none of these were part of its Amended Complaint.

A second essential element of a valid equal protection claim is also missing: evidence that sign owners similarly situated to Central Radio were treated differently.  The evidence shows that, after the City became aware of these other signs, an investigation was commenced and enforcement action was taken.  (J.A. 401-405, 408-417, 423-424, 453, 528).  Several owners of the property on which the noncompliant signs were displayed received citations.[18]  (J.A. 408-417, 467-469).  The lone exception was a sign at the Nauticus building, against which enforcement action was considered but was held off by direction of the city manager.  (J.A. 766).  Even then, Central Radio failed to show that the decision to forego enforcement was motivated by a desire to favor some particular message.

Of the three other signs that Central Radio identifies in support of their claim, (Br. of Appellant 51), nothing in the record indicates that any of them actually violated the Sign Code.  A sign located at Chrysler Hall looked large, "but without the actual measurements" City staff could not say if it complied or not.  (J.A. 761).  A sign that was installed in the public right-of-way was reported to enforcement, but it did not violate anything in the zoning ordinance, which is

---

[18]  The City's zoning administrator testified that he had received a complaint about a sign located on property of the Commonwealth of Virginia.  (J.A. 980).  However, the City's local zoning regulations are not enforced against state-owned property.  (J.A. 974).  Thus the decision not to pursue enforcement against a sign located on state property is based on a lack of authority to prosecute a superior sovereign entity, not a decision to selectively enforce the rules for some discriminatory, unlawful purpose.

where the Sign Code is codified.[19]  (J.A. 542-544).  And a sign with a message about President Obama was investigated but not cited as a violation.  (J.A. 1127-1131).  Given that the record contains no evidence of the size of the sign, the zoning district, or whether it was even located on property that is subject to the zoning regulations set forth in the Sign Code, it is impossible to conclude—as Central Radio nevertheless does—that the sign was illegal.  More importantly, nothing in the record indicates that the decision not to issue a citation was "motivated by a discriminatory purpose," which is a necessary element of Central Radio's equal protection claim.  *Wayte*, 470 U.S. at 608.

Because the undisputed material facts did not include any showing that the City elected not to enforce the Sign Code against other signs similar to Central Radio's for a discriminatory reason, the district court was correct to identify this failure of proof, (J.A. 1214), and dismiss the equal protection claim.

After its equal protection claim has withered and died for lack of evidence, Central Radio now makes a late push to add new facts—some of which are not in the record and others of which are demonstrably false—to try to show a discriminatory purpose behind the City's enforcement.  In its brief, it argues that

---

[19]  The regulations in the Sign Code apply to signs on properties that are located within any defined zoning district.  (J.A. 273 at § 16-8).  In Norfolk, zoning districts do not extend beyond the property line and the public right-of-way is not captured within any zoning district (J.A. 348), which explains why a sign in a right-of-way lies outside the scope of the Sign Code.  Such signs are, however, addressed under the Norfolk City Code.  (J.A. 481 at § 42-10(b)).

the evidence supports a finding of "discriminatory purpose" based on several avenues of factual inquiry identified in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). (Br. of Appellant 54-60). We discuss each in turn.

Central Radio says that the City's enforcement of the size limit weighed more heavily on it than on anyone else in Norfolk. (Br. of Appellant 55-56). As proof, they say that Central Radio needed the sign when it was needed most, as the NRHA was waging an eminent domain action against its property. *Id.* Absolutely nothing in the rather substantial record proves that a 375 square foot sign was needed for the company to achieve its objectives. Ironically, the goal of the sign—to "clarify that we did not want Central Radio's property to be taken" (J.A. 38-39 at ¶ 4)—ultimately *was* achieved, even though the sign was not even on display. *See PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth.*, 286 Va. 174, 184, 747 S.E.2d 826, 831 (Va. 2013) (holding that the NRHA failed to timely complete the process of taking properties that were included in the Hampton Boulevard Redevelopment Project such as Central Radio's). The assertion that Central Radio was harmed more than other property owners who were cited for having illegal signs is groundless.

Next, Central Radio argues that the events leading up the City's enforcement action were based on a discriminatory purpose. (Br. of Appellant 56). Again,

there is no evidence to support this notion. The undisputed facts show that at no time—from the initial receipt of the complaint, through the investigation, and ending with the issuance of citations—did any City employee involved with this enforcement action have any knowledge that the origin of the inquiry about Central Radio's sign was someone who worked for the Old Dominion Real Estate Foundation. (J.A. 430-431, 437, 451-452, 462-465). The first time the origin of that inquiry was disclosed to anyone was *after* Central Radio commenced this lawsuit. (J.A. 462-465). Eager to imply a connection where none exists in fact, Central Radio imputes knowledge to enforcement personnel that, undeniably, none of them had. Its claim that the City took action against the sign because it discriminates in favor of the Old Dominion Real Estate Foundation is fabricated, constructed out of something other than an assessment of the facts.

Thirdly, Central Radio charges that the City's enforcement action was a substantive departure from the "normal procedural sequence," in part because one of the inspectors discussed the situation with the Director of Planning, Mr. Duke, and the Manager of Land Use Services, Mr. Newcomb. (Br. of Appellant 56-58). For at least two reasons, this claim is baseless. First, the City's normal procedural sequence *was* followed. Nearly all sign investigations commence with a complaint. (J.A. 392, 427, 831-832, 1054). True to form, the investigation of

Central Radio's sign started with a complaint, received on March 29, 2013. (J.A. 150).

Next, an inspector typically visits the site. (J.A. 392, 1054). If the sign is found to be illegal but can be readily corrected, the sign inspector usually issues a verbal notice. (J.A. 490-492, 516, 1056, 1158, 1162). That is exactly what was done in the instant case, when inspector Tanner visited the Property during the last week of March. (J.A. 326, 438-439).

In a routine case, the inspector determines at a subsequent visit whether the sign has been brought into compliance. (J.A. 1158-1159). When inspector Tanner returned to Central Radio's property a week later he found the noncompliant sign still on display and issued a written violation notice (J.A. 228, 439-440), as did inspector Garrett (J.A. 229) who had heard about a large sign at the Property from a co-worker (J.A. 449).

Sometimes more than one enforcement officer investigates a situation (J.A. 1036), particularly if "something new comes up" (J.A. 440) or if a particular case is complicated (J.A. 663). Here, both Ms. Garrett and Mr. Tanner visited the Property simultaneously "so it wasn't two separate visits." (J.A. 440, 449). Ms. Garrett, who had been working as a zoning inspector in Norfolk for more than fifteen years (J.A. 1049), had *never before* had cause to give a warning or written citation to someone for posting a protest sign. (J.A. 1124). The Central Radio

situation truly *was* something new—exactly the sort of thing that might require involving more than just one inspector.  (J.A. 440).

The second reason why Central Radio's claim is baseless is because the established practice of the City's zoning enforcement staff *is* to consult with zoning officials whenever he or she has uncertainties about a situation, such as a question about how to interpret the Sign Code (J.A. 675-676, 1145-1147), or if a particular situation is unclear, such as when a freedom of speech issue arises.  (J.A. 1065-1066).  Obviously, both of those circumstances were implicated by Central Radio's sign.[20]  The company's argument that it has proven discriminatory intent and a violation of the Fourteenth Amendment by showing that an inspector discussed the sign with the City's zoning services manager is unconvincing and contraindicated by the facts considered in their entirety.

---

[20]  Central Radio claims that its banner criticizes "the City itself," and avers that it is this message which instigated the City's inordinate response.  (Br. of Appellant 57).  This is a false.  The banner does *not* criticize the City.  (J.A. 222). A vice president of Central Radio testified that none of the actions related to the attempted taking of his property—the actions Central Radio was complaining about—were actions of the City.  (J.A. 309).  Central Radio took no issue with any action by the City other than its enforcement against the sign.  (J.A. 310).  Once again, it appears that Central Radio is attempting to conflate the NRHA's effort to take the Property with the City's effort to reduce the size of the sign, ostensibly to create the misimpression that the City disfavored the sign's message.  Under oath in open court, Central Radio's representative could not identify a single person who had a negative response to its banner.  (J.A. 314-315).  And the one City inspector that expressed her opinion about it expressed her *empathy* for the business owners.  (J.A. 555).

60

Finally, Central Radio claims that facts about "legislative and administrative history" prove that the City's enforcement had a discriminatory purpose. (Br. of Appellant 58). The allegations relied upon to support this theory are taken from the Internet—content that was never included in either of the parties' motions for summary judgment, which has never been authenticated, which the City has had no opportunity to rebut, and which is nowhere in the record. Because its reliance on this extrajudicial material does not comport with the requirements of F. R. Civ. P. 56(c), Central Radio could not rely upon it in support of its Motion for Summary Judgment and it cannot rely upon it in this appeal.

> B.    The complaint-based approach does not violate Central Radio's right to free speech under the First Amendment.

The City does not challenge the presumption that its complaint-based enforcement process is likely to result in the issuance of a number of citations that is smaller than the actual number of extant violations within the City's jurisdictional boundaries at any given point in time. And we are mindful of the concern which the Supreme Court has identified with such an approach. A government that grants certain speakers waivers from rules that otherwise should apply can constitute a violation of the First Amendment if "a pattern of unlawful favoritism appears." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

No such pattern appears in this case. That the practice of enforcing the Sign Code relies upon information provided to the City by citizen complainants says

nothing about what messages the City favors or disfavors, if any.  Surely the presence of an illegal sign that has never reported to the City cannot be considered proof of any unconstitutional action (or inaction) by its enforcement staff.

Central Radio hypothesizes that the City's complaint-based process could lead to the creation of a community in which illegal signs containing messages that disgruntled citizens dislike are targeted for enforcement while illegal signs with messages no one opposes are allowed to remain on display.  (Br. of Appellant 59-60).  This is pure speculation.  There are no facts to indicate that such a situation has been created in Norfolk.  The critical assumption in Central Radio's hypothesis is that the most likely reason why a citizen would complain about an illegal sign would be its message.  (Br. of Appellant 59).  This conjecture has no basis in the evidence and, actually, is contradicted by it.

The citizen that brought Central Radio's sign to the attention of a City employee reported that "there's a large sign at Central Radio."  (J.A. 459-460).  The sole concern the complainant expressed about the sign was its size.  (J.A. 461).  Neither that citizen nor anyone else ever expressed disagreement with the message.  (J.A. 314-315).  And when Central Radio brought a list of large signs to the City's attention, it alleged that they were "similar in size" to its own sign.  (J.A. 25-26).  There is nothing to suggest that Central Radio reported these signs because it opposed the messages they displayed.  Central Radio was unable to produce even

one person who complained about a sign because of the message, exposing its argument as meritless.

In the end, Central Radio offers no precedent for its theory that Norfolk's reliance on citizen complaints to identify possible illegal signs or its failure to discover and prosecute every single sign violation with the relentless, pervasive efficiency that might be achievable in a full-blown police state violates any part of the United States Constitution.

## CONCLUSION

For all of the foregoing reasons, the City asks this Honorable Court to reverse the district court's grant of the motion for extension and dismiss Central Radio's appeal (Record No. 13-1996) or, in the alternative, affirm the district court's grant of summary judgment to the City, denial of summary judgment to Central Radio, and dismissal of this matter.

## REQUEST FOR ORAL ARGUMENT

The City respectfully requests oral argument on the issues presented by this case, including the "excusable neglect" issue.

**CITY OF NORFOLK**

/s/ Adam D. Melita
Adam D. Melita
Virginia bar number 41716
Attorney for City of Norfolk
City Attorney's Office
810 Union Street
Norfolk, VA 23510
Phone: 757-664-4366
Fax:  757-664-4201
adam.melita@norfolk.gov

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*15,958*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>November 12, 2013</u>          <u>/s/ Adam D. Melita</u>
                                          *Counsel for Appellee/Cross – Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 12th day of November, 2013, I caused this Brief of Appellee/Cross – Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Robert P. Frommer, Esq. (VA Bar No. 70086)
> Michael E. Bindas (WA Bar No. 31590)*
> Erica Smith (NY Registration No. 4963377)*
> 901 North Glebe Rd., Suite 900
> Arlington, VA 22203-1854
> E-mails:     RFrommer@ij.org
>                   MBindas@ij.org
>                   ESmith@ij.org
> Attorneys for Appellants/Cross-Appellees
> *Admitted Pro Hac Vice

I further certify that on this 12th day of November, 2013, I caused the required copies of the Brief of Appellee/Cross – Appellant to be hand filed with the Clerk of the Court.

> /s/ Adam D. Melita
> Counsel for Appellee/Cross – Appellant